UNITED STATES of America,
Plaintiff–Appellee,

v.

Roberto LOPEZ–MARTINEZ,
Defendant–Appellant.

No. 93–2137.

United States Court of Appeals,
Tenth Circuit.

June 3, 1994.

Charles A. Harwood, Silver City, NM, for defendant-appellant.

Kelly H. Burnham, Asst. U.S. Atty., Las Cruces, NM (Larry Gomez, U.S. Atty., Albuquerque, NM, and Judith A. Patton, Asst. U.S. Atty., Las Cruces, NM, on the brief), for plaintiff-appellee.

Before EBEL and McKAY, Circuit Judges, and VAN BEBBER, District Judge.[1]

EBEL, Circuit Judge.

This direct criminal appeal returns us to a well-traveled road: the constitutionality of a roving border patrol stop on New Mexico's Highway 185. The Defendant–Appellant, Roberto Lopez–Martinez ("Lopez–Martinez"), appeals from the district court's denial of his suppression motion. Because we concur with the court's determination that the U.S. Border Patrol Agent demonstrated the requisite reasonable suspicion necessary under the Fourth Amendment to stop Lo-

pez–Martinez's vehicle and to inquire about the citizenship of his passengers, we affirm.

## I.

This case arose when U.S. Border Patrol Agent Dale Jones ("Agent Jones") stopped Lopez–Martinez's van in Radium Springs, New Mexico, and discovered four undocumented aliens riding in the vehicle. At 10:00 a.m. on June 20, 1992, while on routine patrol, Agent Jones observed a van and a sedan exit Interstate 25 from the northbound lanes at the Radium Springs exit—less than ten miles south of the Las Cruces immigration checkpoint on Interstate 25 and less than sixty miles from the United States–Mexico border. Travelling in close proximity to one another, the two vehicles turned west on Route 157 and headed toward Highway 185, a north-south thoroughfare that runs parallel to Interstate 25. This stretch of Highway 185 is considered a notorious route by which to circumvent the Interstate 25 checkpoint north of Las Cruces.

Agent Jones initially noticed the two vehicles while he was driving east on Route 157. He promptly turned west, in the direction of the vehicles, and drove his unmarked border patrol vehicle between the van and the sedan. When Agent Jones passed the sedan, he noticed four Hispanic male passengers. Agent Jones also noted that the two vehicles' license plates indicated that the vehicles were registered in Northern New Mexico. In addition, after Agent Jones passed the sedan in order to drive between the two vehicles, the sedan dropped back approximately 100 yards. Agent Jones followed the van as it turned north on Highway 185; the sedan followed behind.

Given the close proximity in which the two vehicles had been travelling despite the absence of traffic, Agent Jones surmised that the van and the sedan were travelling in tandem. He grew more suspicious of their enterprise when he noted that both vehicles drove 30 miles per hour along Highway 185 in a 55 mile per hour zone. Next, Agent

1. The Honorable G. Thomas Van Bebber, United States District Judge for the District of Kansas, sitting by designation.

Jones watched as a passenger in the van peered through the van's back window, stared at Agent Jones for roughly twenty to thirty seconds, and then "sank back out of sight." Although Agent Jones drove in an unmarked vehicle, the vehicle contained a visible security cage separating the front and back seats and Agent Jones wore a uniform. Agent Jones conducted a registration check on the van based on the license plate numbers, but discovered nothing extraordinary.

His suspicion nevertheless aroused by the surrounding circumstances, Agent Jones stopped the van on Highway 185, just north of Radium Springs. Agent Jones discovered Lopez–Martinez driving the van and verified his United States citizenship. As the sedan drove past the scene, Agent Jones asked Lopez–Martinez whether he was travelling with the other vehicle, to which Lopez–Martinez replied: "No we are not together. He is going to Albuquerque." Agent Jones promptly discovered four undocumented aliens in Lopez–Martinez's van.

On July 30, 1992, Lopez–Martinez filed a motion to suppress the evidence gathered at the stop along Highway 185, contending that Agent Jones lacked reasonable suspicion to conduct the roving border patrol stop. After the court issued extensive factual findings and denied his suppression motion, Lopez–Martinez entered a conditional guilty plea to a two-count indictment charging him with transporting illegal aliens, in violation of 8 U.S.C. § 1324(a)(1)(B)[2]; and aiding and abetting, in violation of 18 U.S.C. § 2. Before us is Lopez–Martinez's timely appeal of the court's denial of his suppression motion.

## II.

In reviewing the court's denial of a motion to suppress evidence, "we must accept the court's factual findings unless they are clearly erroneous and must consider the evidence in the light most favorable to the govern-

ment." *United States v. Maestas*, 2 F.3d 1485, 1490 (10th Cir.1993). "The ultimate determination of reasonableness under the fourth amendment is, however, a conclusion of law that we review de novo." *United States v. Guillen–Cazares*, 989 F.2d 380, 382 (10th Cir.1993). Insofar as Lopez–Martinez does not dispute the court's factual findings, we proceed directly to review the court's legal conclusion that Agent Jones' reasonable suspicion warranted the roadside stop that gave rise to Lopez–Martinez's guilty plea.

■ The Supreme Court instructs that border patrol "officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *United States v. Brignoni–Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607 (1975). Derived from the principles underlying *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the "reasonable suspicion" standard for roving border patrol stops reflects the Court's balancing of "the importance of the governmental interest at stake, the minimal intrusion of a brief stop, and the absence of practical alternatives for policing the border." *Brignoni–Ponce*, 422 U.S. at 881, 95 S.Ct. at 2580.

In *Brignoni–Ponce*, the Court unveiled a non-exhaustive, multi-factor test that guides our inquiry into whether Agent Jones demonstrated the requisite reasonable suspicion necessary under the Fourth Amendment to stop Lopez–Martinez's vehicle and inquire about the citizenship of his passengers, which we have summarized:

> In determining whether there is reasonable suspicion to stop a car in the border area, officers may consider any number of factors, including: (1) characteristics of the area in which the vehicle is encountered; (2) the proximity of the area to the border; (3) the usual patterns of traffic on the

---

2. 8 U.S.C. § 1324(a)(1)(B) provides in pertinent part:

Any person who ... knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within

the United States by means of transportation or otherwise, in furtherance of such violation of law ... shall be fined in accordance with Title 18, or imprisoned not more than five years, or both, for each alien in respect to whom any violation of this paragraph occurs.

particular road; (4) the previous experience of the agent with alien traffic; (5) information about recent illegal border crossings in the area; (6) the driver's behavior, including any obvious attempts to evade officers; (7) aspects of the vehicle, such as a station wagon with concealed compartments; and (8) the appearance that the vehicle is heavily loaded.

*United States v. Monsisvais*, 907 F.2d 987, 990 (10th Cir.1990) (citing *Brignoni–Ponce*, 422 U.S. at 884–85, 95 S.Ct. at 2582).

■ Agent Jones is "entitled to assess the facts in light of his experience in detecting illegal entry and smuggling," *Brignoni–Ponce*, 442 U.S. at 885, 95 S.Ct. at 2582, and we must scrutinize his decision to stop Lopez–Martinez by examining the "totality of the circumstances." *United States v. Sokolow*, 490 U.S. 1, 8, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989); *United States v. Barbee*, 968 F.2d 1026, 1028 (10th Cir.1992). Neither *Brignoni–Ponce* nor its progeny identify a minimum number of factors necessary to constitute reasonable suspicion or any outcome determinative criteria. Indeed, such an approach would be antithetical to a totality of the circumstances inquiry.

Insofar as our roving "border patrol stop cases are fact driven and must be considered on a case-to-case basis," *United States v. Martin*, 15 F.3d 943, 950 (10th Cir.1994), Lopez–Martinez is not persuasive in his attempt to distill our numerous opinions and to isolate three factors from the *Brignoni–Ponce* test that always exist when we have upheld a roving border patrol stop. *Compare United States v. Barbee*, 968 F.2d at 1028 (upholding evening stop of vehicle, with out-of-state license plates, driving on a little-used highway commonly used by alien and drug smugglers, where passengers in back seat crouched down when headlights illuminated them), *with Martin*, 15 F.3d at 945 (upholding early evening stop on New Mexico's Highway 185, despite vehicle's in-state license plates, given extensive additional surrounding facts). Contrary to Lopez–Martinez's contention, "[t]he concept of reasonable suspicion, like probable cause, is not 'readily, or even usefully, reduced to a neat set of legal rules,'" *Sokolow*, 490 U.S. at 7,

109 S.Ct. at 1585 (quoting *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983)), and we decline his invitation to proclaim an ironclad formula.

■ To be sure, an officer's specific articulable facts, when viewed in isolation, will often comport with general notions of innocent travel rather than criminal activity. Roads situated adjacent to an international border facilitate legitimate traffic. There is nothing inherently suspect about a van or station wagon utilizing such a thoroughfare. Our task, however, is not to pigeonhole each purported fact as either consistent with innocent travel or manifestly suspicious. Rather, the reasonable suspicion calculus turns on whether the specific articulable facts, when viewed together through the lens of a reasonable law enforcement officer, justified a brief roadside detention to determine whether the vehicle contained undocumented aliens. *See Brignoni–Ponce*, 422 U.S. at 884–885, 95 S.Ct. at 2582; *see also Terry*, 392 U.S. at 22–23, 88 S.Ct. at 1880–81 (acknowledging that "a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation"); *Sokolow*, 490 U.S. at 9, 109 S.Ct. at 1586 ("Any one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel. But we think taken together they amount to reasonable suspicion."); *Gates*, 462 U.S. at 244 n. 13, 103 S.Ct. at 2335 n. 13 ("[I]nnocent behavior frequently will provide the basis for a showing of probable cause.... In making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts."). In fact, the Supreme Court has expressly acknowledged law enforcement officers' prerogative to perceive and articulate meaning in actions that, to the untrained observer, appear innocuous. *Brown v. Texas*, 443 U.S. 47, 52 & n. 2, 99 S.Ct. 2637, 2641 & n. 2, 61 L.Ed.2d 357 (1979).

### III.

Mindful of these principles, we turn to examine the specific facts that Agent Jones articulated as grounds for stopping Lopez–

Martinez's van. Unlike the scant record in *Monsisvais* that precluded us from adequately assessing the reasonableness of the border patrol agent's stop, *Monsisvais,* 907 F.2d at 990–91, the record on appeal in the instant case includes extensive factual findings by the district court.

### A. The Characteristics of the Area

■ The characteristics of the area in which Agent Jones encountered Lopez–Martinez's vehicle and the accompanying sedan strongly support the court's finding of reasonable suspicion. Agent Jones testified that he watched the two vehicles exit Interstate 25 from the northbound lanes at the Radium Springs exit, less than ten miles south of the Las Cruces immigration checkpoint on Interstate 25. In addition, the government presented data revealing the number of aliens apprehended within close proximity to the fixed immigration checkpoints in southern New Mexico.[3] Nor does Lopez–Martinez refute the government's evidence that, aside from a few retail establishments at which he did not stop, both the crossover road from Interstate 25 to Highway 185 and Highway 185 wind through minimally populated desert area and provide a slower, more circuitous northbound route than on Interstate 25. *Compare United States v. Miranda–Enriquez,* 941 F.2d 1081, 1083–84 (10th Cir.1991) (agent lacked reasonable suspicion to stop driver when he first saw him on Highway 52, which also serves as an access road for tourists visiting a nearby lake).[4]

### B. The Proximity of the Area to the Border

■ Because Agent Jones encountered Lopez–Martinez less than sixty miles from the United States–Mexico border, the proximity of the stop to the border also weighs in favor of the reasonableness of Agent Jones' suspicion that Lopez–Martinez was en route

from the border. *See* 8 CFR § 287.1(a)(2) (defining "reasonable distance" under 8 U.S.C. § 1357(a)(3), statute authorizing immigration officials to conduct warrantless stops, as "within 100 air miles from any external boundary of the United States"). Although we eschew any inflexible mile benchmark in considering the second *Brignoni–Ponce* factor, we find the federal regulations informative. In addition, there is a marked contrast in distances from the border between this case and *U.S. v. Venzor–Castillo,* 991 F.2d 634, 639 (10th Cir.1993), where we held that the agent lacked reasonable suspicion to conduct a stop 235 miles from border. *See also Barbee,* 968 F.2d at 1028 (upholding stop that occurred in vicinity of Truth of Consequences checkpoint, north of Las Cruces).

### C. The Usual Patterns of Traffic on the Particular Road

■ Agent Jones' comparisons between Lopez–Martinez's actions and the usual patterns of traffic on the crossover road between Interstate 25 and Highway 185, and Highway 185 itself, further supports the court's finding. Agent Jones testified that because July is green chile harvesting season, farm traffic along these routes is heavy at dawn, but nearly nonexistent at 10:00 a.m. when he encountered Lopez–Martinez's van and the sedan. Lopez–Martinez's evidence speaks to the daily volume of traffic along these thoroughfares, but in no way refutes Agent Jones' testimony that the traffic is concentrated in the early morning and early afternoon, when farm laborers travel to and from work. *Compare Miranda–Enriquez,* 941 F.2d at 1084 (agent testified to his inability to predict the likelihood of alien smugglers travelling on highway when stop occurred).

---

**3.** According to Agent Jones' testimony, between November 1991 and November 1992, agents stationed at the Las Cruces checkpoint apprehended 970 undocumented aliens, resulting in 269 cases. Of these 269 cases, 74 arose from apprehensions at the fixed checkpoints and 195 resulted from investigative stops along roads, and in the desert, within a ten mile radius of the fixed checkpoints.

**4.** Although the U.S. Border Patrol also operates a fixed immigration checkpoint along Highway 185, the station was closed the day Agent Jones encountered Lopez–Martinez and the previous day as well.

### D. The Agent's Previous Experience with Alien Traffic and Information about Recent Illegal Border Crossings

■ Consistent with *Brignoni–Ponce,* we must also accord weight to Agent Jones' eighteen-year experience as a U.S. Border Patrol Agent and his promotion to the rank of Supervisory Border Patrol Agent. *Brignoni–Ponce,* 422 U.S. at 885, 95 S.Ct. at 2582. Agent Jones has worked in Southern New Mexico for approximately fourteen of his eighteen years as an agent and testified to his familiarity with alien traffic on the roads through Las Cruces and its environs. Agent Jones conceded that he had not received information about recent illegal border crossings in the area, but he explained that alien smuggling precipitously increases during the summer months due to farm employment (between 1,000 and 1,300 aliens are discovered per summer month, as opposed to between 500 and 1,000 during other months).

### E. The Driver's Behavior

■ Additionally probative to our evaluation of Agent Jones' decision to conduct the stop is Lopez–Martinez's driving behavior. *Brignoni–Ponce,* 422 U.S. at 885, 95 S.Ct. at 2582; *United States v. Pollack,* 895 F.2d 686, 690 (10th Cir.), *cert. denied,* 498 U.S. 985, 111 S.Ct. 520, 112 L.Ed.2d 532 (1990). Lopez–Martinez opted to exit northbound Interstate 25 yet continue to travel north on Highway 185, a well-documented means of circumventing the Las Cruces checkpoint and a less direct northbound route. *See Martin,* 15 F.3d at 945; *see also U.S. v. Guillen–Cazares,* 989 F.2d at 383 (acknowledging that agent's discovery of a driver along a road purportedly used to avoid the Truth or Consequences checkpoint weighs in favor of reasonable suspicion); *Barbee,* 968 F.2d at 1029 (same).

In addition to Lopez–Martinez's decision to exit Interstate 25 just south of the known immigration checkpoint yet continue to travel north, Lopez–Martinez appeared to be driving in tandem with a second vehicle and at a speed of 30 miles per hour on an empty road with a posted 55 mile per hour speed limit. The district court reasoned that the slow speed of both the van and the sedan was suspicious because there were no other vehicles in the area and they were driving throughout an area where the posted speed limit was significantly higher. In addition, although Agent Jones drove in an unmarked Border Patrol vehicle, he believed that the driver of the van and the driver of the sedan recognized his vehicle as a police vehicle because of the visible metal security cage separating the front and back seats as well as the fact that Agent Jones wore a uniform. Because maintaining a noticeably slow speed in the presence of a police officer may suggest nervousness, we cannot accept the dissent's conclusion that the speed of the vehicles is "simply irrelevant when considered in the totality of the circumstances."

Next, Agent Jones explained that aliens are often smuggled in caravans to enable a lead vehicle to determine whether a known checkpoint is open. We have held that the mere "existence of two cars, proceeding closely together and turning south on I–25 does not evoke the same types of suspicions as other situations and maneuvers found in roving border patrol cases." *Guillen–Cazares,* 989 F.2d at 383. Whereas we found nothing inherently suspicious about the two vehicles in *Guillen–Cazares* entering Interstate 25 south, here Agent Jones noted that Lopez–Martinez's van and the sedan exited Interstate 25 north just south of the Las Cruces checkpoint, drove past the few retail establishments along the way, and proceeded north on Highway 185. That the vehicles in the instant case drove close together at the same slow pace and only separated when Agent Jones passed the sedan gave further grounds for reasonable suspicion.

### F. Aspects and Appearance of the Vehicle

■ Although Agent Jones acknowledged that neither vehicle appeared to be heavily loaded, *Barbee,* 968 F.2d at 1029, Lopez–Martinez's van could transport several passengers hidden from passersby. *Pollack,* 895 F.2d at 690 (suspect was driving "a large vehicle capable of hauling a large number of people"); *Brignoni–Ponce,* 422 U.S. at 885, 95 S.Ct. at 2582 (identifying station wagons with large compartments for fold-down seats

or spare tires as popular vehicles in which to transport concealed aliens). In addition to noticing four Hispanic passengers in the sedan, *Id.*, Agent Jones watched as a passenger in the van peered out the rear window and then disappeared. *Barbee*, 968 F.2d at 1029 ("Also important is that the agent making the stop observed the passengers sinking down in an apparent effort to avoid detection.").

To be sure, the fact that the passengers appeared to be Hispanic could not, by itself, create the reasonable suspicion required under the Fourth Amendment to conduct a roving border patrol stop. *Brignoni–Ponce*, 422 U.S. at 886–87, 95 S.Ct. at 2583. As the dissent correctly points out, the overwhelming number of Hispanics in this country are United States citizens, not illegal aliens. However, the Court in *Brignoni–Ponce* explained that "Mexican appearance [is] a relevant factor" when the stop occurs near the United States–Mexico border. *Id.*; *see also United States v. Martinez–Fuerte*, 428 U.S. 543, 564 n. 17, 96 S.Ct. 3074, 3085 n. 17, 49 L.Ed.2d 1116 (1976) (reaffirming that "apparent Mexican ancestry ... clearly is relevant [at a checkpoint near the United States–Mexico border]").

### IV.

Lopez–Martinez's attempt to isolate each of the aforementioned facts and describe how each is consistent with legitimate travel ignores the Supreme Court's direction to examine "the whole picture" and consider whether Agent Jones had a "particularized and objective basis for suspecting [Lopez–Martinez] of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). Given the district court's extensive and uncontroverted factual findings, we conclude that the totality of the specific articulable facts, viewed in the light most favorable to the government, reasonably prompted Agent Jones to suspect that Lopez–Martinez's van contained undocumented aliens.

Accordingly, the investigative stop did not run afoul of the Fourth Amendment and the district court's judgment is AFFIRMED.

McKAY, Circuit Judge, dissenting:

Although I ultimately reach the conclusion that the district court must be reversed, my primary concern lies with the majority's mode of analysis which blurs the precision required in a *Terry* -type inquiry. When the layers of gloss are removed and the facts are analyzed accordingly, it is clear to me that Agent Jones acted on a mere hunch rather than on such articulable facts sufficient to vest him with objective, reasonable suspicion. Even more troublesome, it is clear to me that Agent Jones did not make *rational inferences* from some of the facts on which he purportedly relied as mandated by *Terry*—nor does the majority's framework require him to do so. Therefore, I dissent. I believe the majority has made three doctrinal errors. When what I believe to be the correct view of *Terry* and our Fourth Amendment jurisprudence is applied to the specific facts of this case, I believe it becomes clear that the district court erred in denying Defendant's suppression motion.

My first problem with the majority opinion is its undue reliance on the eight generic factors in *United States v. Brignoni–Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 2581–82, 45 L.Ed.2d 607 (1975). While the majority recognizes that the *Brignoni–Ponce* factors were not intended to be exhaustive or mandatory but merely to provide some guidance in appropriate circumstances, it then proceeds to analyze those factors in numerical order. In doing so, the majority opinion places the *truly* relevant facts—the physical circumstances surrounding the stop on which Agent Jones relied—into neat categories named for the *Brignoni–Ponce* factors, and assigns weight to each fact in accordance with its effect on the *Brignoni–Ponce* factor into which it has been categorized. My point is not that *Brignoni–Ponce* should be ignored; I simply believe that *Brignoni–Ponce* —in a structural sense—is not particularly helpful to the case at hand. I reach this conclusion by considering the totality of the circumstances. As the majority points out, when viewed in relation to the totality, arguably suspicious facts can take on more significance when viewed together with other related facts—thus, the whole can equal more

than the sum of its parts. Other seemingly suspicious facts, however, can lose significance when properly viewed against the backdrop of the circumstances as a whole, and this I believe to be the fate of many of the generic *Brignoni–Ponce* factors in this case.

Consider the circumstances of this case. In the location where Agent Jones was patrolling on the day in question, *any* automobile would automatically satisfy at least half of the *Brignoni–Ponce* factors. A station wagon or van travelling north on a highway that does not have an immigration checkpoint would satisfy nearly all of them. Yet, Agent Jones cannot stop every car that he passes while on duty. This fact compels my conclusion that it was the unique facts stemming from the circumstances surrounding Defendant's automobile—the factual circumstances that distinguished Defendant's car from all of the others—that fueled Agent Jones' suspicions. These facts, along with their chronological order, their relation to one another, and whether as a whole they would invite suspicion in a reasonable officer should be the focus of the inquiry—not how each pigeonholed fact weighs into a particular factor in the *Brignoni–Ponce* equation. By structuring the opinion and analyzing the facts in terms of the *Brignoni–Ponce* factors, the majority fails to analyze the case in a realistic setting and fails to measure the effect that the important facts reasonably might have had on one another. The end result is that the majority's opinion does not seem to me to carry the necessary discipline in assigning weight to the various factual circumstances or in determining whether the inferences that Agent Jones claims he made from each fact were rational under the circumstances.

My second problem with the majority opinion is related to the first, and stems from its application of the "totality of the circumstances" analysis. According to the majority, the "totality of the circumstances" test apparently mandates the following procedure: first, gather all of the suspicious facts that the officer might have considered; second, take an analytical step backwards so that the field of facts can be viewed as a whole at one time rather than focus on specific facts (in other words, enlarge the scope and blur the lens); and third, make a decision, while still viewing the facts holistically, as to whether reasonable suspicion exists. This procedure skips an important step and places an unwarranted and destructive gloss on *Terry*. Although it may seem counterintuitive, I believe that the "totality of the circumstances" test, together with the language in *Terry* requiring "rational inferences" from each fact, mandates a more exacting inquiry into each individual fact before it can be included in the holistic picture.

As the majority points out, a whole can be greater than the sum of its parts when the parts relate to each other in such a way as to inflate their individual worth. For example, several suspicious facts may, if analyzed one at a time and in isolation, fall far short of constituting reasonable suspicion for a drunk driving stop (*e.g.*, driver exiting bar before getting into car, driver tripping on sidewalk before getting into car, and driver with previous drunk driving convictions). When the three facts are placed together in one scenario, however, their relationship to each other elevates their individual significance, and reasonable suspicion may then exist. Obviously, for this inferential building-block procedure to occur, the facts must relate to each other in such a way that the heightened inference is rational. Each fact must be individually examined in its context to determine if it builds on the others—that is, whether it rationally and logically fuels the line of suspicion that is being investigated. While this may seem obvious, by jumping immediately to the wide-lens "totality test," the majority opinion appears to have skipped the narrow inquiry into each fact and its relationship to the others. As a result, the majority opinion weighs several facts in favor of the government which I believe are totally irrelevant to this case when viewed in the proper "totality" setting. Contrary to its name, the "totality of the circumstances" test, when analyzed within the analytical framework of *Terry*, is not always a mechanism of fact inclusion; carefully scrutinizing the rational relationship between facts often means that some otherwise-suspicious circumstances become irrelevant.

My third problem is the majority's failure to discipline the "officer experience" doctrine. As I read the cases cited by the majority, the court should defer to the interpretive abilities of experienced officers in certain situations. For example, an average citizen may think nothing of a burlap bag in the trunk of a car, but to an experienced police officer, a burlap bag may indicate the possibility of drugs. A court should defer to an officer, however, only on questions that relate to an articulable knowledge, skill, or interpretive ability that an officer actually has developed through experience—and only on questions that comport with *Terry*. I believe that the majority was correct in crediting Agent Jones' experience in witnessing immigration violators travelling in automobiles in tandem. This is something that an officer actually could learn through experience, and it is an articulable fact. However, the majority also seems to use "officer experience" in an imprecise, abstract sense to allow Agent Jones to make inferences of suspicion from the wide-lens totality viewpoint. To me, this comes close to granting Agent Jones powers of extrasensory perception. While an experienced officer may believe that he has become an expert at picking persons guilty of crimes out of a crowd simply by relying on his "gut feeling," *Terry*'s requirement for "articulable facts" doesn't allow him to use this skill. Likewise, *Terry* ensures that officers cannot use intuitive or other magical powers gained through experience to find something suspicious in a hodgepodge of unrelated facts. The "officer experience" doctrine may be used to determine which facts were rationally suspicious to the trained officer. However, when looking at the facts holistically and drawing abstract inferences therefrom, I do not think that an officer's experience should be used to further blur the lens and tilt the balance in favor of the government.

To summarize so far, the majority opinion, in its imprecision, adds three layers of gloss to *Terry*. The first is created by compartmentalizing the facts as they relate to the *Brignoni–Ponce* categories rather than examining their relationship to each other chronologically and in their totality. The second is created by skipping directly to the wide-lens totality viewpoint without first scrutinizing the individual facts to determine whether they fit into the big picture and whether rational inferences can be drawn from them. Finally, the court's use of the "officer-experience" doctrine seems to me undisciplined and in effect creates a subjective criteria which could ultimately swallow whatever discipline remains in stops based on the *Terry* exception to Fourth Amendment constraints. What follows is my review of the facts of this case in light of the discipline I believe is mandated where the *Terry* exception is relied on to detain persons travelling on public highways.

The first relevant facts relate to Agent Jones' initial suspicions: 1) the two vehicles, a van and a sedan, pulled off of a highway that has an immigration checkpoint onto a notorious alien-smuggling route; and 2) the vehicles appeared to be travelling together, which from Agent Jones' experience indicated the possibility that they were smuggling aliens. Although I would not measure these facts in terms of their relation to a *Brignoni–Ponce* factor, I agree with the majority that these facts are objectively and reasonably probative of an alien-smuggling operation, although they are clearly not sufficient standing alone to constitute reasonable suspicion. The automobiles in this case had New Mexico license plates, and obviously the New Mexico Highway Department created Highway 185 for many uses other than to provide aliens with a means to circumvent Interstate 25.

Next, acting on his initial suspicions, Agent Jones decided to follow the two vehicles, and, for some unexplained reason, positioned his car between the van and the sedan, directly and very close behind the van. As he passed the sedan on his way to squeeze between the cars, Agent Jones noticed that the passengers of the sedan were of Hispanic descent. This is an appropriate time to discuss the role of race in the "reasonable suspicion" equation in this case. The majority places the ancestry of the passengers into the *Brignoni–Ponce* category entitled "Aspects and Appearance of the Vehicle" and seems to believe that the passengers' race reasonably added to Agent Jones' suspicions. The majority's failure to analyze the passengers'

race in the totality of the surroundings is the cause of this clear error.

Agent Jones' duty is to patrol southern New Mexico to curb the flow of illegal aliens across the Mexican border. He looks for signs of persons who are illegally in this country from South America. Logically, he should have been unconcerned had a carload of Caucasian or African American persons turned onto the highway that skirts Interstate 25. If he had been suspicious of an immigration violation when a carload of African Americans turned onto the road in question, his suspicions could not have survived the "rational inference" test of *Terry*. Similarly, had Agent Jones pulled up alongside a sedan filled with African Americans in this case, his original suspicions of an immigration violation would have vitiated. Defendant's actions of turning onto Highway 185 and driving with another car are entirely legal and innocent on their face. These actions only carry connotations of suspicion under the circumstances if the occupants are Hispanic. Therefore, the fact that the passengers turned out to be Hispanic in this case logically *added nothing* to Agent Jones' suspicions at this point—he was already operating under the assumption that the passengers were Hispanic because the initial events that raised his suspicions would not be rationally suspicious otherwise.

There should have been nothing unusual or suspicious to Agent Jones about the simple fact of seeing a car with Hispanic people in it. Those of Hispanic origin are members of the second most represented race in the diverse state of New Mexico and account for more than thirty-eight percent of that state's population. *See* John W. Wright, *The Universal Almanac* 285 (1994) (citing statistics from the U.S. Bureau of Census, 1991). Common sense indicates that Agent Jones saw cars carrying Hispanic persons all day long on the day in question. Considered in the totality of the circumstances, the passengers' race acted merely as a triggering circumstance— it gave meaning to the acts of travelling in tandem and avoiding a highway that has a checkpoint, and it made those events rationally suspicious. Other than verifying Agent Jones' initial suspicions, however, it had ab-

solutely *no* independent value in the reasonable suspicion calculus. Any additional inference made from the discovery of the suspects' race, beyond inferences already drawn by the preceding events, simply cannot withstand the "rational inference" requirement of *Terry* and would inject a troubling racial bias into the *Terry* analysis. *See Gonzalez–Rivera v. Immigration and Naturalization Service,* 22 F.3d 1441 (9th Cir.1994).

Next, as the majority states, Agent Jones "grew more suspicious ... when he noted that both vehicles drove 30 miles per hour ... in a 55 mile per hour zone." The majority recognizes that driving below the speed limit is an entirely legal activity, but notes that legal activities can take on suspicious connotations under certain circumstances. The opinion then fails to determine whether the circumstances were such that slow driving was rationally suspicious. Instead, the majority places this fact under the *Brignoni–Ponce* factor entitled "The Driver's Behavior," and since it is an abnormal driver behavior, finds it to be "probative" in favor of the government in the reasonable suspicion inquiry. Like race, but for different reasons, the speed of the vehicles is simply irrelevant when considered in the totality of the circumstances and without the various layers of gloss added by the majority.

Agent Jones claimed that the initial behavior of the automobiles made him suspicious of an immigration violation. Indeed, a possible immigration violation is the *only* crime one could rationally infer from the facts up to this point. I do not understand how the majority could find, on the record before us, that Agent Jones made a *rational inference* when he grew more suspicious of an immigration violation because of the slow driving. Although Agent Jones might have rationally concluded that the van was having mechanical problems—which the record reflects it in fact was, that the drivers were looking for a particular street to make a turn, that they were looking at a map to figure out directions, or that the drivers were just unusually cautious, it was not rational for him to draw the conclusion that the van contained illegal aliens merely from the speed with which it was proceeding down Highway 185.

There is no evidence in the record suggesting that illegal aliens drive slowly. Nor has Agent Jones asserted that, based on his extensive experience, immigration smugglers typically drive below the speed limit. The problem with the slow driving is that the majority did not inquire into its rational relationship to the other facts under the totality of the circumstances. It simply does not fit into the inferential block-building process in any way, and could not rationally add fuel to Agent Jones' suspicions of an immigration violation. *See United States v. Peters*, 10 F.3d 1517 (10th Cir.1993) (careful driving not factor in determining reasonable suspicion of an immigration violation where driver drove ten miles below the speed limit, looked straight ahead, and gripped the wheel tightly). Slow driving may be relevant to reasonable suspicion for some crimes, such as drunk driving, but it simply does not support a rational inference of suspicion under the facts of this case.

The majority indicates that slow driving "may suggest nervousness." To begin with, generic claims of nervousness are viewed with caution by the Tenth Circuit. *Id.* at 1521. In this case, however, we are not even dealing with generic claims of nervous behavior, but legal conduct that *may suggest* nervousness, which is one step further removed. Given all the innocent reasons why someone might drive below the speed limit, and all of the subjective criteria which could "suggest nervousness," I do not find this fact particularly probative in support of reasonable suspicion. Agent Jones' recollection of the slow driving has the flavor of an after-the-fact justification for a stop rather than something that truly fueled his suspicions of an alien-smuggling operation under the totality of the circumstances.

After Agent Jones drove his patrol car between the van and the sedan and forced the sedan to back off, a passenger in the back of the van proceeded to "stare" at him for twenty to thirty seconds out of the back window and then "sank back out of sight." Placing the passenger's conduct in the "Aspects and Appearance of the Vehicle" category, the majority, without discussion, agrees with Agent Jones that this conduct was suspicious and therefore weighs it in favor of a finding of reasonable suspicion. In doing so, the court once again errs. First of all, the court believes that this conduct was suspicious because it was purportedly an act done to avoid detection. Indeed, the sole case cited in support of its finding is an "avoiding detection" case. Although I agree with the majority that acts done to avoid detection are objectively suspicious, I do not understand how staring at a patrol agent for twenty seconds can be considered "avoiding detection," and therefore fall within that line of cases. If anything, this conduct is just the opposite, and manifests a certain sense of confidence. Part of the problem is caused by the majority's linguistics when it adopts the government's labelling of the passenger's movement away from the window as "sinking back out of sight," which has a suspicious or furtive connotation to it. However, to look out of the back window of a van, a passenger would either have to sit backwards on a couch-like seat (if the van has passenger seats in the back), or squat on the floor (if it is a cargo van). It is hard for me to imagine any movement out of one of these positions that couldn't be considered "sinking back" from the perspective of someone driving behind the van. Had the passenger already been in full view and then ducked out of sight as soon as he saw Agent Jones, a different inference might legitimately be drawn. That is not the case here, however. Thus, despite the language used, I do not believe that the government has satisfied its burden of proving that the passenger's "staring" or movements were objectively suspicious. Agent Jones has not articulated an ability, gained from experience, to derive suspicion from routine and objectively unsuspicious movements—nor is this the type of fact where officer expertise, discounting ESP, could somehow fill in the gaps.

My conclusion that the passenger's movement and staring did not reasonably contribute to Agent Jones' suspicions is further solidified by considering the totality of the circumstances. Besides being a patrol agent, Agent Jones is a citizen who presumably uses the highways for personal reasons and should be aware of the cultural norms and codes that have developed on the highways.

I would take judicial notice of the fact that, if a driver rudely cuts between two cars that are obviously driving together and may be depending on each other for directions, and in the process tailgates or drives very close to the front car, he should not be surprised if someone in the front car reacts in some way, the least offensive manner being a mere "stare." I do not think that any reasonable person would grow suspicious of a crime if he gets a "look" or gesture of some sort from a driver or passenger of another car that he has just put in jeopardy because of his haphazard driving. Growing suspicious of a crime under such a circumstance is simply irrational and cannot withstand the "rational inference" requirement of *Terry*. Besides the fact that I would not allow law enforcement officers to create or invoke responses that they can then label as suspicious, the conduct of the passenger in this case was not objectively suspicious when considered either by itself or in the totality of the circumstances.

Finally, I must comment on the evidence concerning the flow of traffic on the road in question. Agent Jones testified that his suspicions were fueled by the fact that the automobiles were travelling on Highway 185 at 10:00 a.m., a time when traffic on that highway is usually very light. Agent Jones stated that the only time the road is heavily travelled is at dawn when the chile pickers are driving to work. Defendant refuted this testimony with evidence indicating that Highway 185 is a heavily travelled road, although Defendant's evidence did not speak to the distribution of traffic throughout the day. The majority holds that Agent Jones' testimony "further supports the court's finding" of reasonable suspicion, noting that the record indicates that the road is heavily travelled around dawn, the time when farm workers are travelling to the chile fields, but the road is not heavily travelled at 10:00 a.m. Again, the majority's analysis suffers from a gap in logic. For this evidence to rationally support inferences of suspicion, more information must be supplied. However, there is no evidence in the record indicating that immigration smugglers like to travel around 10:00 a.m., that they try to avoid flows of heavy traffic, that they try to avoid farm traffic, or anything else that would fill the missing gap in the chain of logic. Logic suggests that alien smugglers would prefer to travel when there is heavy traffic so as to avoid standing out as unusual, or at night to avoid detection—our cases suggest the same. Of course, the implicit assumption behind Agent Jones' testimony is that the Defendant and his companions caught his attention and aroused his suspicions because they were Hispanic and did not travel with or otherwise act like chile pickers—with all the missing information discussed above, this is the only inference of suspicion that can be made from the stated facts. Beside the fact that it utterly fails the rational inference requirement of *Terry*, I cannot sign on to this kind of stereotyping for reasons far too obvious to mention.

At this point, after analyzing the facts in the totality of the circumstances, the Fourth Amendment and *Terry* require a balancing test. The court must weigh the government's interest in law enforcement against society's interest in remaining free from government intrusions. The balancing stage is the proper time to consider many of the *Brignoni–Ponce* factors, such as the close proximity to the U.S.–Mexican border, current information about immigration violations, etc. These factors remind the court that the government has a heightened interest in this case because of the surrounding circumstances. Even considering the government's heightened interest as discussed in *Brignoni–Ponce*, I believe that the stop in this case was unreasonable. After considering the facts in their proper setting, the only facts from which rational inferences of suspicion can be made are: 1) the pulling off of Interstate 25 onto Highway 185, and 2) the fact that the cars seemed to be travelling together. I question whether the first fact is truly suspicious, considering that Highway 185 also has an immigration checkpoint, and we have no evidence indicating that Defendant was aware that the Highway 185 checkpoint was closed on the day in question. In other words, the government has not met its burden of proving that this was conduct designed to avoid detection. For the sake of analysis, however, I will assume that the

conduct was objectively suspicious.[1] Even still, I fear that the majority's undue reliance on *Brignoni–Ponce* will essentially allow any Hispanic in the southern half of New Mexico to be pulled over without restraint. At best, any Hispanic who appears to be travelling with another car, and who is driving in southern New Mexico on a road that is used by alien smugglers, will have little Fourth Amendment protection. Such an intrusion on thirty-eight percent of the population of that state, in my mind, clearly outweighs the government's need to have carte-blanche authority to make such stops. Although I have stated throughout this dissent that Agent Jones made irrational inferences, one could just as reasonably conclude that he acted on a mere hunch, and then recalled instances of potentially suspicious conduct after the fact in attempt to justify his intrusion. Because ratifying this stop threatens the reasonable expectations of innocent citizens to be free from undisciplined and unwarranted stops on our public highways, I would reverse the district court and require it to grant Defendant's suppression motion.

---

1. Although two cars travelling together could objectively give rise to reasonable inferences of suspicion for an immigration violation in some circumstances, I also question, based on the inconsistencies in Agent Jones' testimony, whether that was the case here. Agent Jones testified that he becomes suspicious when he sees two cars travelling together because illegal aliens often travel in caravans of two or more cars so that the lead car can determine if a checkpoint is open, allowing the aliens in the trailing cars to avoid all open checkpoints. Logically, a caravan of alien smugglers would situate most, if not all, of the illegal aliens in the trailing vehicles that will be able to avoid the open checkpoints—otherwise, the purpose of this strategy is defeated. In this case, however, Agent Jones grew suspicious of and stopped the lead car, the car that presumably would not have been carrying aliens under his theory. Moreover, it is illogical to conclude that a lead vehicle and the vehicle carrying aliens would travel so closely together that Agent Jones would have to "sandwich" his car between them. Doing so would defeat the purpose of having a lead vehicle because the two vehicles would arrive at the checkpoint at the same time. Surely we are not to believe that, if upon seeing that the checkpoint was open, the car containing the aliens reversed direction, the customs service would simply wave to it as it disappeared into the sunset. To the contrary, such behavior would be highly suspicious. However, notwithstanding the inherent illogic of the facts as presented by Agent Jones, for the purpose of my analysis I will assume that this fact—the manner in which the two vehicles travelled together—is reasonably and objectively suspicious of an immigration violation.