43 F.3d 1484
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Efrain GUTIERREZ-LEYVA, Defendant-Appellant.
 No. 93-2287.
 United States Court of Appeals, Tenth Circuit.
 Dec. 14, 1994.
 
 1
 Before TACHA and EBEL, Circuit Judges, and ROGERS,** District Judge.
 
 ORDER AND JUDGMENT[1]
 
 2
 After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed.R.App.P. 34(a); 10th Cir. R. 34.1.9. The case is therefore ordered submitted without oral argument.
 
 
 3
 Defendant appeals the district court's denial of his motion to suppress evidence. Because we hold that defendant's stop was based on reasonable suspicion, as was his continued detention, we affirm.
 
 
 4
 At approximately four o'clock in the afternoon on February 7, 1993, Border Patrol agent Luis Perez was travelling north on Interstate 25 to open the border patrol checkpoint on that interstate north of Las Cruces, New Mexico. En route, he saw a Ford Granada bearing Chihuahua, Mexico, license plates with only one occupant also travelling north on Interstate 25. Interstate 25 is a direct route north from the Mexico/United States border. The interstate was heavily trafficked on the day and time in question. Knowing that the Ford Granada would not be stopped at the checkpoint because it was not open, Agent Perez decided to follow the vehicle in an attempt to determine whether the vehicle might be carrying illegal aliens.
 
 
 5
 Defendant was travelling with the flow of traffic at about sixty to sixty-five miles per hour. The speed limit on that stretch of interstate was fifty-five miles per hour. Agent Perez pulled up alongside defendant and travelled in that manner for about forty-five seconds. In response, defendant gripped the steering wheel, stared straight ahead at the road, and slowed down to a speed of what Agent Perez approximated to be forty-five miles per hour. Agent Perez testified that, despite his efforts, he was unable to view the inside of defendant's vehicle.
 
 
 6
 Traffic began to build up behind the two cars, so Agent Perez passed defendant and exited at the next off-ramp onto an overpass in an attempt to better observe the interior of defendant's vehicle. When defendant passed under the overpass, at a resumed flow-of-traffic speed, Agent Perez still did not see inside the vehicle, so he got back on the interstate to follow defendant. Once Agent Perez was directly behind defendant, defendant once again slowed to a speed of approximately forty-five miles per hour. At that point, Agent Perez radioed for backup and stopped defendant.
 
 
 7
 As Agent Perez got out of his car and approached the Ford Granada, he noticed that the car was very clean, as if it had just been washed, and the tires were shiny black, with the exception of the left rear wheel well, which was covered with dried mud. That circumstance drew his attention because he knew that Ford Granadas have a built-in compartment that is accessed from a trap door in the area of the left rear wheel well. In fact, Agent Perez had personal experience the day before with narcotics being found in the built-in compartment in another Ford Granada. In addition, Agent Perez testified that contraband had been found in at least eight Ford Granadas at his checkpoint, of which four occurrences were within a two-week period, and that he personally had a similar experience with one other such car.
 
 
 8
 Agent Perez approached defendant and requested his citizenship papers. As defendant handed over his temporary resident alien card, Agent Perez noticed that his hand was visibly shaking. Agent Perez testified that he delayed taking the card so that he could be sure he observed defendant shaking. In addition, defendant stared straight ahead when Agent Perez attempted to talk to him. Agent Perez testified that such nervous behavior was not common in people he stopped.
 
 
 9
 Agent Perez could not see anyone else in the vehicle and, noticing what appeared to be nervous behavior, the agent's attention turned to the trunk of the vehicle. After defendant indicated that there was nothing in the trunk in response to the agent's question, Agent Perez obtained defendant's permission to look in the trunk. Finding nothing in the trunk, Agent Perez questioned defendant about his travel origin and destination. Defendant responded that he was travelling from Mexico to Hatch, New Mexico, to work. Agent Perez also questioned him about the foreign license plates, which the agent found unusual since defendant stated that he resided in New Mexico. Defendant indicated that he had borrowed the car from a cousin in Mexico.
 
 
 10
 Having determined that there was nothing in the trunk, but remaining suspicious about the dried mud in the area of the access to the built-in compartment, Agent Perez asked defendant for permission to search the vehicle. Defendant consented to a search and Agent Perez went directly to the area covered with dried mud. He bent down and scraped some of the mud off with his knife; wet Bondo fell off, indicating to Agent Perez that the built-in compartment had been accessed recently.[2] At that point Agent Perez and his backup agent transported defendant and his vehicle to the checkpoint where they opened the compartment and discovered two halved drive shafts filled with marijuana.
 
 
 11
 Defendant argues on appeal that the initial stop violated his Fourth Amendment rights. Alternatively, defendant argues that, even if the initial stop was based on reasonable suspicion, his Fourth Amendment rights were violated by his continued detention after Agent Perez determined that there were no illegal aliens in the vehicle.
 
 
 12
 Our standard of review is clear: "we must accept the court's factual findings unless they are clearly erroneous and must consider the evidence in the light most favorable to the government. The ultimate determination of reasonableness under the fourth amendment is, however, a conclusion of law that we review de novo." United States v. Lopez-Martinez, 25 F.3d 1481, 1483 (10th Cir.1994) (citations omitted).
 
 
 13
 Border patrol "officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." United States v. Brignoni-Ponce, 422 U.S. 873, 884 (1975). Brignoni-Ponce points us to a number of factors to be considered in grappling with the issue of whether reasonable suspicion exists to stop a car in a border area: proximity to the border; usual traffic patterns on the road; the agent's previous experience with alien traffic; information about recent illegal border crossings; the driver's behavior, including any obvious attempts to evade officers; aspects of the particular vehicle, such as large compartments conducive to alien concealment; and appearance that the vehicle may be heavily loaded. Id. at 884-85.
 
 
 14
 The totality of the circumstances drives the determination of reasonable suspicion on a case-by-case basis; the facts cannot be considered in isolation. Lopez-Martinez, 25 F.3d at 1484. Furthermore, a border patrol agent is " 'entitled to assess the facts in light of his experience in detecting illegal entry and smuggling.' " Id. (quoting Brignoni-Ponce, 422 U.S. at 885).
 
 Initial Stop
 
 15
 Defendant maintains that there is an absence of specific articulable facts regarding the initial stop of his vehicle to support a reasonable suspicion by Agent Perez that defendant's vehicle contained undocumented aliens. We disagree.
 
 
 16
 We realize that any one of the circumstances contributing to Agent Perez's reasonable suspicion might, in and of itself, be entirely consistent with innocent activity. See Lopez-Martinez, 25 F.3d at 1484. We are required, however, to consider the circumstances in totality. Id. When viewed in that fashion, we hold that the facts presented here justify Agent Perez's initial stop as based upon reasonable suspicion.
 
 
 17
 Defendant was stopped going north on Interstate 25, which is a direct route from Mexico. He was travelling in a car with Chihuahua license plates, which led Agent Perez to believe defendant was coming from Mexico. The vehicle in which defendant was travelling caught the agent's attention because he knew that Ford Granadas have a built-in compartment sometimes used to smuggle drugs. Finally, both when Agent Perez pulled alongside defendant's vehicle and when he later pulled up behind defendant's vehicle, defendant reduced his speed dramatically by about twenty miles per hour, behavior that was not exhibited by any other driver in the vicinity. Defendant reduced his speed to approximately ten miles below the speed limit, a speed slow enough to impede the flow of traffic when Agent Perez was travelling beside defendant.[3] These facts, when considered together, are sufficient to arouse a reasonable suspicion of criminal activity.[4]
 
 Continued Detention
 
 18
 Defendant argues that once Agent Perez satisfied himself as to defendant's legal presence in the country and determined that there were no illegal aliens in the vehicle, further detention violated defendant's Fourth Amendment rights. We disagree.
 
 
 19
 Defendant cites this court's decision in United States v. Millan-Diaz, 975 F.2d 720 (10th Cir.1992), in support of his argument that, once Agent Perez searched the trunk and found no illegal aliens, the agent should have terminated the encounter and allowed defendant to go on his way. Instead, Agent Perez continued questioning defendant and requested permission to further search the vehicle. Defendant's reliance on Millan-Diaz is unpersuasive; that case is clearly distinguishable. In Millan-Diaz, the agent's reasonable suspicion prompting the initial stop to search for illegal aliens was dispelled once he examined the passenger compartment and trunk and found no illegal aliens. Id. at 722.
 
 
 20
 In this case, Agent Perez noticed the dried mud-covered rear wheel well when he approached defendant's vehicle immediately after the initial stop. Agent Perez's knowledge and experience regarding the built-in compartment accessed in that area on that particular vehicle allowed him to attach special significance to his visual observations and newly aroused his suspicion of illegal activity. In addition, defendant's hand visibly shook when he handed the agent his temporary resident alien card. Agent Perez's visual observations of the physical outward appearance of the Ford Granada and defendant's physical display of nervous behavior, coupled with the agent's knowledge and experience regarding the built-in compartment being used to smuggle drugs, created a reasonable suspicion to justify defendant's continued detention. See United States v. Fernandez, 18 F.3d 874, 878 (10th Cir.1994)(requiring reasonable suspicion to justify continued detention).
 
 
 21
 AFFIRMED.
 
 
 22
 ROGERS, District Judge, dissenting.
 
 
 23
 I dissent from the majority's decision because I do not believe that reasonable suspicion existed to justify the investigatory stop of the car appellant was driving.
 
 
 24
 It is correct to consider appellant's reduction in speed when he noticed he was being followed by a patrol car. But, I believe too much significance has been attached to it by the majority, particularly when appellant decelerated from a speed exceeding the posted speed limit. After reviewing U.S. v. Diaz, 977 F.2d 163 (5th Cir.1992); U.S. v. Hernandez-Alvarado, 891 F.2d 1414 (9th Cir.1989); U.S. v. Gonzales, 841 F.Supp. 377 (D.N.M.1993); and U.S. v. Abdon-Limas, 780 F.Supp. 773 (D.N.M.1991), I do not believe the decrease in speed in combination with the other factors in this case provided a reasonable suspicion of criminal activity.
 
 
 25
 For the foregoing reasons, I would respectfully dissent.
 
 
 
 **
 Honorable Richard D. Rogers, United States District Judge for the District of Kansas, sitting by designation
 
 
 [1]
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. 151 F.R.D. 470
 
 
 [2]
 Agent Perez testified that Bondo is a substance used as a body filler in vehicle repair
 
 
 [3]
 We attach no significance to the fact that defendant gripped the steering wheel and stared straight ahead while Agent Perez travelled beside defendant's vehicle. We find nothing indicative of nervousness in such behavior. See United States v. Peters, 10 F.3d 1517, 1522 (10th Cir.1993). We note that, as evidenced by its failure to mention this behavior in its oral ruling, it appears that the district court also did not attach significance to such behavior
 
 
 [4]
 The facts surrounding defendant's dramatic speed reduction are distinguishable from those in Peters where, in response to the government's argument that maintaining a speed of fifty-five miles per hour in a sixty-five mile per hour zone was indicative of nervous behavior, we stated that "the cautious driving of a rented moving truck, whose drivers are often inexperienced with the operation of large vehicles, cannot standing alone support a reasonable suspicion of illegal activity." 10 F.3d at 1522. Here, we are presented with no such extenuating circumstances surrounding defendant's slow speed. Defendant reduced his speed only when the agent was beside or behind him, and defendant's speed was not the sole basis for Agent Perez's reasonable suspicion