**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 9 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

GUADALUPE QUINTANA-GARCIA,

Defendant - Appellant.

No. 02-2127

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. CR-01-1110-JC)

---

Norman Cairns, Assistant United States Attorney, Albuquerque, New Mexico
(David C. Iglesias, United States Attorney, Albuquerque, New Mexico, with him
on the brief), for Plaintiff-Appellee.

Rosanne Camunez, Las Cruces, New Mexico, for Defendant-Appellant.

---

Before **EBEL**, Circuit Judge, **McWILLIAMS**, Senior Circuit Judge, and
**MURPHY**, Circuit Judge.

---

**EBEL**, Circuit Judge.

Defendant-Appellant Guadalupe Quintana-Garcia ("Defendant") entered a conditional guilty plea to a three-count indictment charging her with conspiring to possess with intent to distribute less than 50 kilograms of marijuana, in violation of 21 U.S.C. § 846; possession with intent to distribute less than 50 kilograms of marijuana, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(d) and 18 U.S.C. § 2; and possession of cocaine, in violation of 21 U.S.C. § 844. She reserved her right to appeal the district court's denial of her motion to suppress evidence obtained as the result of a Border Patrol Agent's allegedly illegal stop of the vehicle in which she was traveling. We take jurisdiction pursuant to 28 U.S.C. § 1291 and, for the reasons that follow, AFFIRM the district court's denial of Defendant's motion to suppress.

## I. BACKGROUND[1]

On the morning of June 30, 2001, Border Patrol Agent Rudy Sanchez parked his marked patrol vehicle on the side of Highway 26, a road that carries mostly local traffic between the towns of Deming and Hatch in southern New Mexico, approximately 50 to 60 miles from the Mexican border. There are three permanent Border Patrol checkpoints in southern New Mexico but none on

---

[1]The facts in this section are taken from the district court's factual findings at the hearing on Defendant's motion to suppress and from testimony given at that hearing.

Highway 26, which is known as a "back door" for smugglers wanting to avoid the checkpoints.

At approximately 11:45 a.m., Agent Sanchez saw a large, gray Chevy Suburban traveling north on Highway 26, away from the Mexican border. Having previously arrested smugglers of both illegal aliens and drugs who drove sport utility vehicles, he knew that smugglers tended to prefer large vehicles because they can carry more cargo. The Suburban also had tinted windows, which is another feature preferred by smugglers, and Mexican license plates, which was somewhat unusual as most of the traffic on Highway 26 was local traffic used by New Mexico residents in the area. Agent Sanchez learned from a radio dispatcher that the car had passed through a border checkpoint at the Mexican border approximately two to three hours earlier. Agent Sanchez also thought it significant, for two reasons, that the car was approaching his area around lunchtime. First, one week earlier he had apprehended a vehicle carrying illegal aliens around lunchtime. Second, Border Patrol agents had learned through interviews and investigation that smugglers knew the agents' schedules and would often try to slip past them at lunch or during shift changes.

Agent Sanchez's vehicle was not equipped with a radar device, but he estimated that the car was traveling about 75 miles per hour, 10 miles per hour above the posted speed limit. The district court found that in Agent Sanchez's

- 3 -

experience, "smugglers move [as] quickly as possible through the border area to make certain that their presence for any protracted period doesn't expose them to interception." As the car approached (and presumably saw) Agent Sanchez's vehicle, it slowed "significantly," which indicated to Agent Sanchez that the driver did not want to be "detected or be noticed if they were transporting illegal aliens."

Based on these observations, Agent Sanchez suspected that the driver of the Suburban might be smuggling illegal aliens. He pulled onto the highway and began to follow the Suburban, but he did not at that time turn on his flashing lights or his siren. As he followed it, the Suburban slowed again, this time to approximately 45–50 miles per hour. It soon slowed even further and pulled over to the right side of the road, still moving. Agent Sanchez was worried, based on experience, that the occupants of the Suburban might attempt a "bailout," which is an escape tactic in which the occupants jump from a slowly moving car and run in different directions to avoid capture. As the Suburban pulled to the side of the road, Agent Sanchez turned on his patrol vehicle's flashing lights. Unlike most cars, the Suburban did not stop immediately; rather, it continued moving for approximately another minute before it stopped.

Agent Sanchez exited his vehicle and approached the Suburban. He spoke first to the driver, Leahmanda Barnes, and asked her if she was a United States

citizen. She said that she was and produced her driver's license. He then asked the person sitting in the passenger's seat, Defendant, if she was a U.S. citizen. Defendant produced her border crossing card, which showed that she was a Mexican national. A border crossing card allows the holder to cross the Mexico/U.S. border as long as she stays within 25 miles of the border; to go farther, a special permit is required.[2] Agent Sanchez then asked Barnes if she owned the vehicle, and Barnes told him that Defendant owned it. Agent Sanchez asked Defendant if that was correct, and Defendant indicated that she did not speak English.

Agent Sanchez switched to Spanish and continued questioning Defendant about her ownership of the Suburban. As he did so, he "smelled a strong odor" that he "recognized as silicone sealant." Agent Sanchez said that based on his experience, "silicone sealant, along with bondo, are the two most commonly used materials to secrete [sic] narcotics[,] to seal trap doors, to seal compartments, and it aroused [his] suspicion that this vehicle might be carrying narcotics." Based on this suspicion, Agent Sanchez asked Defendant for permission to have his K9 police dog inspect the Suburban. Defendant consented.

---

[2]The parties dispute whether Defendant also produced at that time an I-94 permit, which was necessary for her to have legally traveled more than 25 miles beyond the border. Because the motion to suppress focused on Agent Sanchez's initial reasons for stopping the Suburban, however, that dispute is not relevant to our disposition of this case and we therefore need not resolve it.

During the inspection, the police dog alerted to the Suburban's gas tank. Agent Sanchez noticed immediately that the bolts attaching the gas tank to the vehicle had been tampered with: "they had shiny tool marks on them, and the hose, the filler neck hose, the camp, was left loose, it was just dangling there, it had not even been tightened down." When Agent Sanchez used a fiberoptic scope to inspect the gas tank, he saw fresh welding marks inside it, which indicated to him that something was hidden in the tank. He then asked Defendant and Barnes if they would follow him to a nearby Border Patrol checkpoint where he could further examine the tank. They agreed to do so. At the checkpoint, the gas tank was opened and twenty-one bundles of marijuana, weighing approximately ninety-three pounds, were found inside. Defendant also had some cocaine in her purse.

Defendant moved to suppress the evidence obtained as a result of the stop on the ground that Agent Sanchez lacked the required reasonable suspicion to conduct the stop. After a hearing, the district court denied the motion. Defendant was later sentenced to, inter alia, 330 days' imprisonment and two years' supervised release.

## II. DISCUSSION

In reviewing a district court's denial of a motion to suppress, we accept the district court's factual findings unless they are clearly erroneous. United States v.

Gandara-Salinas, 327 F.3d 1127, 1129 (10th Cir. 2003).  We review de novo, however, the ultimate question of Fourth Amendment reasonableness.  Id.

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest."  United States v. Arvizu, 534 U.S. 266, 273 (2002) (citing Terry v. Ohio, 392 U.S. 1, 9 (1968), and United States v. Cortez, 449 U.S. 411, 417 (1981)).  The requirements of the Fourth Amendment are satisfied in this context "if the officer's action is supported by reasonable suspicion to believe that criminal activity '"may be afoot."'"  Id. (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting Terry, 392 U.S. at 30)).

The Supreme Court has emphasized that, in determining whether an investigatory stop is supported by reasonable suspicion, courts must "'look at the totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing."  Id.  The evaluation is made from the perspective of the reasonable officer, not the reasonable person.  Officers must be permitted "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'"  Id. (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)); see also Gandara-Salinas, 327 F.3d at 1130.

In determining whether a stop in a border area is supported by reasonable suspicion, the following factors are relevant:

> (1) characteristics of the area in which the vehicle is encountered; (2) the proximity of the area to the border; (3) the usual patterns of traffic on the particular road; (4) the previous experience of the agent with alien traffic; (5) information about recent illegal border crossings in the area; (6) the driver's behavior, including any obvious attempts to evade officers; (7) aspects of the vehicle, such as a station wagon with concealed compartments; and (8) the appearance that the vehicle is heavily loaded.

Gandara-Salinas, 327 F.3d at 1129–30 (quoting United States v. Monsisvais, 907 F.2d 987, 990 (10th Cir. 1990) (citing United States v. Brignoni-Ponce, 422 U.S. 873, 884–85 (1975))). When evaluating these factors, a court must not engage in the kind of "divide-and-conquer analysis" rejected by the Arvizu Court. See Arvizu, 534 U.S. at 274; Gandara-Salinas, 327 F.3d at 1130. That is, a court must not separate out each factor and reject the officer's determination of reasonable suspicion simply because each factor, standing alone, might be "readily susceptible of an innocent explanation." Gandara-Salinas, 327 F.3d at 1130. A proper examination of the totality of the circumstances must recognize that "[i]ndividual factors that may appear innocent in isolation may constitute suspicious behavior when aggregated together." United States v. Diaz-Juarez, 299 F.3d 1138, 1141 (9th Cir. 2002) (citing Sokolow, 490 U.S. at 9–10).[3]

---

[3]In Arvizu, the Court unanimously reversed the Ninth Circuit's decision granting the defendant's motion to suppress based on an allegedly illegal stop.
(continued...)

In the instant case, the district court, after hearing testimony and making factual findings, held that "the totality of the circumstances of which Agent Sanchez was aware at the time he stopped the vehicle[] gave him a reasonable suspicion to justify a stop" under Arvizu.[4] An examination of the eight Brignoni-

_____

[3](...continued)
The Court considered the following facts—any one of which might be considered innocent standing alone—as supporting the Border Patrol agent's finding of reasonable suspicion when considered in the aggregate: 1) the stop occurred in a remote part of rural southeastern Arizona, a region known by law enforcement to be frequented by drug smugglers; 2) the defendant was driving a minivan, a vehicle known to be used by drug smugglers; 3) the minivan slowed considerably when it saw the Border Patrol agent's car on the side of the road; 4) as he passed, the driver of the minivan (the defendant) seemed stiff and his posture rigid, and he did not look at the agent, as if trying to pretend the agent were not there; 5) the time of day indicated that the defendant intended to pass through the area during the agents' shift change; 6) another Border Patrol agent had apprehended a minivan using the same route several weeks before and saw the occupants throwing bundles of marijuana out the door; 7) despite the fact that two adults and three children were in the minivan, which would suggest a family outing, the minivan had turned away from known recreational areas; 8) the children sitting in the back seat had their knees propped up unusually high, as if they were sitting on something; 9) when the Border Patrol agent pulled behind the minivan, the children, while still facing forward, began to wave at the agent in an abnormal way, as if they were being told to do so; 10) the driver signaled as if he were going to turn off onto the last road that could be used to avoid a nearby checkpoint, but then turned his signal off and then back on again as if he could not decide what to do; moreover, that road was rougher than the one he was currently on and used mostly by four-wheel-drive vehicles; and 11) a registration check of the car showed that it was registered to an address only four blocks north of the border and well known for alien- and drug-smuggling.
Arvizu, 534 U.S. at 268–271.

[4]On appeal, Defendant challenges several of the district court's factual findings. Having reviewed those challenges as well as the record in its entirety, we find nothing to persuade us that any of the district court's findings were

(continued...)

Ponce factors—seven of which are present in this case—makes clear that the district court's decision was correct. We address each factor in turn.[5]

With respect to the first Brignoni-Ponce factor—the characteristics of the area in which the vehicle was encountered, 422 U.S. at 884—the district court found that Highway 26 "does not have a permanent checkpoint" and is used as a "back door route" by smugglers who wish to avoid being stopped at a checkpoint. Agent Sanchez said that based on his interviews with alien- and drug-smugglers, "It's pretty clear in [sic] unanimously they say that they try to avoid the checkpoint in various manners through the desert. Highway 26 is what we consider our back door." Defendant counters that most of the traffic on Highway 26 is legitimate local traffic. While this is likely true, the first Brignoni-Ponce factor is only one of several supporting the district court's finding here. Moreover, we emphasize that the aggregation of factors that would appear

---

[4](...continued)
clearly erroneous. For the sake of brevity, we decline to address Defendant's challenges individually.

[5]We pause at the outset to emphasize that even though Agent Sanchez ultimately found drugs in Defendant's vehicle, the issue before us is whether Agent Sanchez's stop was justified by a reasonable suspicion that he would find illegal aliens, which was his articulated reason for initially stopping Defendant's vehicle. See United States v. Williams, 271 F.3d 1262, 1266 (10th Cir. 2001) (noting that the first step in evaluating the constitutionality of an investigative detention is determining whether the stop was "'justified at its inception'") (quoting Terry v. Ohio, 392 U.S. 1, 20 (1968)) (emphasis added).

innocent standing alone can create a supportable finding of reasonable suspicion based on the totality of the circumstances.

The second Brignoni-Ponce factor considers the proximity to the border of the area where the stop was made. 422 U.S. at 884. "While the Supreme Court has cautioned that 'roads near the border carry not only aliens seeking to enter the country illegally, but a large volume of legitimate traffic as well,' proximity to the border may be considered as a factor in the reasonable suspicion calculus." Diaz-Juarez, 299 F.3d at 1142 (quoting Brignoni-Ponce, 422 U.S. at 882).[6] Here, the district court found that the stop was made 50–60 miles from the U.S.-Mexico border, "an area close enough to the border to find illegal entran[ts] who actually are walking northward through this part of southern New Mexico, progressing northward to highways that lead further north into the United States and into the northern part of New Mexico." Moreover, Agent Sanchez performed a check on Defendant's vehicle before stopping it and discovered that it had crossed the border at the Antelope Wells checkpoint about two to three hours earlier that morning. The short distance from the border and the brief amount of time the

[6]We also find it instructive, although not dispositive, that federal law permits Border Patrol agents to make warrantless stops within a "reasonable distance" from the border. 8 U.S.C. § 1357(a)(3). "Reasonable distance" is defined by a federal regulation as, inter alia, 100 miles from the border. 8 C.F.R. § 287.1(a)(2).

vehicle had been in the country were legitimate considerations for Agent Sanchez when making his reasonable suspicion calculus.

The third Brignoni-Ponce factor looks to the usual traffic patterns on the road where the stop was made. 422 U.S. at 884–85. The district court found most traffic on Highway 26 "to be local and used by residents in that area," making the presence of Defendant's vehicle—which bore Mexican license plates—somewhat unusual and thus supportive of reasonable suspicion. The presence of a car bearing non-local (here, Mexican) license plates is one of several factors that, in conjunction with other factors, can support a finding of reasonable suspicion.

The fourth Brignoni-Ponce factor—the agent's previous experience with alien traffic, 422 U.S. at 885—also weighs in favor of a finding of reasonable suspicion. Agent Sanchez, who had six years' experience as a Border Patrol agent, was characterized by the district court as "a highly experienced Border Patrol agent who had interviewed many smugglers of both persons and contraband previously and was well acquainted with their procedures and their preferences in terms of travel." We have no reason to question this finding, and we are mindful of the Supreme Court's statement that "[i]n all situations the officer is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling." Brignoni-Ponce, 422 U.S. at 885 (citing Terry, 392 U.S. at 27); see

- 12 -

also <u>Arvizu</u>, 534 U.S. at 276 ("[Agent] Stoddard was entitled to make an assessment of the situation in light of his specialized training and familiarity with the customs of the area's inhabitants.").

The fifth <u>Brignoni-Ponce</u> factor considers information about recent illegal border crossings in the area where the stop was made. 422 U.S. at 885. <u>Id.</u> About two weeks before his stop and arrest of Defendant, Agent Sanchez stopped another "large vehicle with tinted windows" and Mexican license plates that was riding low, had recently crossed the border and was traveling away from the border on Highway 26 at around the same time of day that he stopped Defendant's vehicle. That vehicle turned out to be carrying illegal aliens. Also, the district court found that smugglers often attempted to pass the area where the stop was made "at times when they would expect officers to be off duty, either having lunch or changing shifts, and the time [of the instant stop] fit the time at which he, Agent Sanchez, or another officer in that area normally would be leaving to go... for lunch." <u>Accord</u> <u>Arvizu</u>, 534 U.S. at 277 ("[Agent] Stoddard's knowledge further supported a commonsense inference that respondent intended to pass through the area at a time when officers would be leaving their backroads patrols to change shifts."); <u>United States v. Espinosa-Alvarado</u>, 302 F.3d 304, 305 n.2 (5th Cir. 2002) ("Smugglers often wait for a shift change to smuggle narcotics or

aliens in the country."). We conclude that the fifth factor also supports a reasonable suspicion finding.

The sixth <u>Brignoni-Ponce</u> factor addresses the driver's behavior prior to the stop. 422 U.S. at 885. Here, the district court found that when Agent Sanchez first spotted Defendant's Suburban, it was traveling approximately 75 miles per hour, and in Agent Sanchez's experience, "smugglers move quickly as possible through the border area to make certain that their presence for any protracted period doesn't expose them to interception." When Agent Sanchez pulled onto the road to follow the Suburban, "its speed dropped precipitously" to approximately 45 miles per hour, and it moved to the right side of the road. This act of slowing down and pulling over—before Agent Sanchez had turned on his patrol vehicle's flashing lights—suggested to him that the occupants may have been attempting a "bailout," whereby they would jump out of the car and run in different directions to evade capture. Finally, the district court found that instead of stopping immediately after he had turned on his patrol vehicle's flashing lights, the Suburban continued to move for one or two minutes, thus reinforcing his suspicion that the occupants might be attempting a bailout. Although a driver's speeding and slowing down upon seeing a patrol car is not in itself unusual, in these circumstances we find that the driver's actions were sufficiently unusual to

have legitimately aroused Agent Sanchez's suspicion. Accordingly, we find the sixth Brignoni-Ponce factor is met in this case.

The seventh Brignoni-Ponce factor considers the features of the vehicle, such as its size and capacity for carrying contraband. 422 U.S. at 885. Here, the vehicle was a large Chevrolet Suburban, which the district court found was frequently used by smugglers because of its capacity to hold a large number of people. Accord Arvizu, 534 U.S. at 270 (noting that the vehicle in question was "a minivan, a type of automobile that [Agent] Stoddard knew smugglers used"). The vehicle also had tinted windows, favored by smugglers for their capacity to conceal what is inside the vehicle. We have little trouble concluding that Defendant's vehicle could be seen by an experienced Border Patrol agent as an effective smuggling vessel and thus that the seventh Brignoni-Ponce factor is met.

The eighth and final Brignoni-Ponce factor considers whether the vehicle appears to be heavily loaded. 422 U.S. at 885. Neither Agent Sanchez nor the district court suggested that the Suburban so appeared. Thus, this factor weighs against a finding of reasonable suspicion in the instant case.

Our review of the district court's factual findings and of the eight Brignoni-Ponce factors leads us to conclude that under the totality of the circumstances, Agent Sanchez's stop of Defendant's vehicle was supported by reasonable suspicion. While "'[a]ny one of these factors is not by itself proof of any illegal

conduct and is quite consistent with innocent travel[,] ... taken together they amount to reasonable suspicion.'" United States v. Neufeld-Neufeld, 338 F.3d 374, 380 (5th Cir. 2003) (quoting Sokolow, 490 U.S. at 9); see also Arvizu, 534 U.S. at 277 ("A determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct.") (citing Illinois v. Wardlow, 528 U.S. 119, 125 (2000)).[7] Accordingly, the district court was correct in denying Defendant's motion to suppress, and we AFFIRM its decision.

_____

[7]See Neufeld-Neufeld, 2003 U.S. App. LEXIS 13635 at **1–4 (affirming the denial of a motion to suppress when the vehicle was thirty-five miles from the border on a well-known smuggling route; braked suddenly and hard upon sight of the patrol vehicle even though it did not appear to be speeding; was not registered locally; and its driver failed to acknowledge the patrol vehicle, sitting stiffly and staring straight ahead with his hands in the 10-2 position taught by driving schools); Gandara-Salinas, 327 F.3d at 1128–31 (reversing the grant of a motion to suppress when the driver's pickup truck had Mexican license plates; had recently crossed the border and was still close to the border; was traveling on a road without a checkpoint and that was known for smuggling; and was carrying a spare tire that was visibly larger than the truck's other tires and cleaner than the rest of the vehicle); Espinosa-Alvarado, 302 F.3d at 305–307 (affirming the denial of a motion to suppress when the driver crossed the border during a shift change; traveled on a highway known for smuggling; slowed to ten miles per hour below the speed limit and began looking in his rearview mirror excessively after spotting the patrol car; slumped down in the seat so as to almost disappear from view; and was about forty-five miles from the border when stopped); Diaz-Juarez, 299 F.3d at 1140–43 (affirming the denial of a motion to suppress when the defendant's vehicle was observed five miles north of the border shortly after midnight in an area known for smuggling activity; was not registered in the area; slowed down and sped up in a manner indicating unfamiliarity with the area; bounced erratically over small bumps; had a rear that appeared raised and a suspension that appeared modified; and where recent police reports indicated that contraband was about to be moved across the border in the area).