**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 14, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ARMANDO MENDEZ,

Defendant - Appellant.

No. 04-2279
(D. New Mexico)
(D.Ct. No. CR-04-311 JB)

**ORDER AND JUDGMENT**[*]

Before **SEYMOUR**, **BALDOCK**, and **O'BRIEN**, Circuit Judges.

On February 19, 2004, Armando Mendez was indicted on one count

of possession with intent to distribute 100 kilograms or more of marijuana in

violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B), one count of conspiracy to

commit the same in violation of 21 U.S.C. § 846, and one count of possessing a

firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. §

924(c)(1)(A)(I), all arising out of a traffic stop near Rodeo, New Mexico. Prior to

---

[*] This order and judgment is not binding precedent except under the doctrines of
law of the case, *res judicata* and collateral estoppel. The court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

trial, Mendez argued the Border Patrol agents lacked reasonable suspicion to make the stop and moved to suppress all subsequent evidence and statements. The district court denied the motion. Mendez timely appealed. We exercise jurisdiction under 28 U.S.C. § 1291 and AFFIRM.

**Background**:

On the morning of November 11, 2003, Jeffrey Stevens, a Senior Border Patrol Agent working an 11:00 p.m. to 7:00 a.m. shift, was traveling southbound on New Mexico Highway 80 near Rodeo, New Mexico, approximately forty miles north of the U.S. border and one mile east of the Arizona state line, looking for illegal aliens that had been smuggled into the country and recently spotted in the area. At approximately 6:50 a.m., Agent Stevens saw a Ford Thunderbird with Arizona license plates traveling north on Highway 80. He stopped his Border Patrol truck until the Thunderbird passed his location. As the car passed, Agent Stevens noticed it was riding low, as if carrying excessive weight. He turned his truck around and followed the Thunderbird to investigate further. While following, Agent Stevens ran a registration check on the Thunderbird's license plate and radioed ahead to another Border Patrol officer stationed in the area, Agent Jose Gonzales. Agent Stevens discontinued his pursuit because his truck lacked emergency lights or a siren. Agent Gonzales located the Thunderbird at approximately 7:10 a.m. Agent Gonzales had his headlights on as the Thunderbird passed his location, and he was able to discern three occupants.

-2-

Additionally, he saw two large square packages on both sides of the back seat passenger and also noticed the car appeared heavily loaded. Agent Gonzales pulled on to the road and began following the Thunderbird. He noticed the trunk lid was not level and a six-inch piece of twine was hanging out of the trunk. Agent Gonzales deemed the twine and large packages consistent with narcotics and marijuana packaging he had encountered in the past.

Based on the packages and the twine, coupled with the apparent weight of the vehicle, Agent Gonzales decided to stop the Thunderbird and investigate further. After he activated his emergency equipment, the Thunderbird pulled over, and Agent Gonzales approached the car on foot. As he approached, Agent Gonzales saw a piece of burlap behind the driver's seat that was consistent with narcotics packaging and smelled the odor of marijuana. Mendez was arrested and approximately 168 kilograms of marijuana and a loaded handgun were seized.

After his indictment, Mendez moved on March 17, 2004 to suppress the evidence resulting from the stop of his vehicle. On July 14, 2004, after a hearing, the district court denied Mendez's motion. The district court held "there was reasonable suspicion to make the stop" under *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975), and *United States v. Arvizu*, 534 U.S. 266, 274 (2002). (R. Vol. III at 114.) Mendez entered a conditional guilty plea reserving the right to appeal the district court's denial of his suppression motion. On September 13, 2004, Mendez was sentenced to 120 months imprisonment. The judgment was

filed on October 18, 2004.  This appeal followed.

**Discussion**:

"Well established standards govern our review of a district court's ruling on a motion to suppress." *United States v. Cantu*, 87 F.3d 1118, 1120 (10th Cir. 1996).  We consider the evidence in the light most favorable to the prevailing party, here the government, and accept the district court's factual findings unless clearly erroneous.  *Id.*; *United States v. Anderson*, 114 F.3d 1059, 1063 (10th Cir. 1997).  But the "ultimate determination of reasonableness under the Fourth Amendment is a question of law reviewable *de novo*."  *United States v. McKissick*, 204 F.3d 1282, 1296 (10th Cir. 2000) (internal quotation omitted).  The defendant bears the burden of establishing the challenged stop violated the Fourth Amendment.  *United States v. Long*, 176 F.3d 1304, 1307 (10th Cir. 1999).

"This case returns the court to familiar geographic and legal territory;  we have frequently been called upon to assess the legality of investigatory stops made by the Border Patrol near the New Mexico-Mexico border."  *United States v. Monsisvais*, 907 F.2d 987, 989 (10th Cir. 1990).  Consistent with the Fourth Amendments' prohibition against unreasonable searches and seizures, "Border Patrol agents 'on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion' that those vehicles' occupants may be involved in criminal activity."  *Cantu*, 87 F.3d at 1121 (quoting *Brignoni-Ponce*, 422 U.S. at

-4-

884).  Reasonable suspicion does "not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard."  *Arvizu*, 534 U.S. at 274.  Rather, "reasonable suspicion represents a 'minimum level of objective justification.'"  *United States v. Mendez*, 118 F.3d 1426, 1431 (10th Cir. 1997) (quoting *United States v. Sokolow,* 490 U.S. 1, 7 (1989)).

"Any number of factors may be taken into account in deciding whether there is reasonable suspicion to stop a car in the border area."  *Brignoni-Ponce*, 422 U.S. at 884.  Officers may consider:

> (1) [the] characteristics of the area in which the vehicle is encountered; (2) the proximity of the area to the border; (3) the usual patterns of traffic on the particular road; (4) the previous experience of the agent with alien traffic; (5) information about recent illegal border crossings in the area; (6) the driver's behavior, including any obvious attempts to evade officers; (7) aspects of the vehicle, such as a station wagon with concealed compartments; and (8) the appearance that the vehicle is heavily loaded.

*Monsisvais*, 907 F.2d at 990 (citing *Brignoni-Ponce*, 422 U.S. at 884-85).  When evaluating an officer's decision to stop a vehicle, a court may not engage in a "sort of divide - and- conquer analysis" by evaluating and rejecting each factor in isolation.  *Arvizu,* 534 U.S. at 274; *United States v. Gandara-Salinas*, 327 F.3d 1127, 1130 (10th Cir. 2003).  This is because factors that by themselves may be "consistent with innocent travel" may collectively amount to reasonable suspicion.  *Arvizu*, 534 U.S. at 274-75 (quoting *Sokolow*, 490 U.S. at 9).  Rather,

"the totality of the circumstances - the whole picture - must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). "In all situations the officer is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling." *Brignoni-Ponce*, 422 U.S. at 885.

An examination of the eight *Brignoni-Ponce* factors - seven of which are present in this case - makes clear the district court's decision was correct.[1] We address the applicable factors in turn. First, we consider the characteristics of the area in which the vehicle was encountered. It is uncontested that New Mexico Highway 80, originating in the border town of Douglas, Arizona, and running north through the sparsely populated "boot heel" of southwestern New Mexico and the city of Rodeo, is a known smuggling route. *See United States v. Quintana-Garcia*, 343 F.3d 1266, 1268 (10th Cir. 2003) (crediting testimony that New Mexico Highway 26 is a known smuggling route); *United States v. Barbee*, 968 F.2d 1026, 1029 (10th Cir. 1992) (crediting officers' uncontested testimony that old New Mexico Highway 52 is a known smuggling route); *but see Monsisvais*, 907 F.2d at 992 (finding that the absence in the record of any detail

---

[1] There is no evidence in the record to support the sixth factor, *i.e.*, that the driver of the vehicle was behaving in a suspect manner or attempting to evade the Border Patrol officers.

as to the characteristics of the same area coupled with statements by the officer that illegal smuggling "sometimes" occurred on New Mexico Highway 85 weighed against finding reasonable suspicion).[2]  This conclusion is supported by the arrest the day before near Rodeo of nineteen illegal aliens  smuggled into the country in a van.  Officer Stevens also testified the Rodeo area sees an increase in illegal smuggling operations when the Arizona branch of the Border Patrol increases its enforcement efforts, as was the case here, because smugglers attempt to avoid detection in that area by taking alternate routes through New Mexico.

Second, we consider the proximity to the border of the area where the stop was made.  "While the Supreme Court has cautioned that 'roads near the border carry not only aliens seeking to enter the country illegally, but a large volume of legitimate traffic as well,' proximity to the border may be considered as a factor in the reasonable suspicion calculus."  *United States v. Diaz-Juarez,* 299 F.3d 1138, 1142 (9th Cir. 2002) (quoting *Brignoni-Ponce,* 422 U.S. at 882).  Obviously, the closer the stop occurs to the border, the more weight we accord to

---

[2] In fact, most north-running highways in southern New Mexico have been characterized as known smuggling routes. *See, e.g., Quintana-Garcia*, 343 F.3d at 1268 (New Mexico Highway 26, running from Demming to Hatch, New Mexico, is a known smuggling route); *United States v. Lopez-Martinez*, 25 F.3d 1481, 1482 & 1485 (10th Cir. 1994) (same as applied to New Mexico Highway 185 near Radium Springs, New Mexico); *Barbee*, 968 F.2d at 1029 (same as applied to old New Mexico Highway 52 near Truth or Consequences, New Mexico); *United States v. Pollack*, 895 F.2d 686, 690 (10th Cir. 1990) (same as applied to New Mexico Highway 85 near Truth or Consequences, New Mexico); *United States v. Leyba*, 627 F.2d 1059, 1063 (10th Cir. 1980) (same as applied to U.S. Highway 180 north of Cliff, New Mexico).

this factor.  Here, the stop occurred approximately forty miles from the U.S.-Mexico border, and approximately fifty miles from the origination point of Highway 80 in the border town of Douglas, Arizona.  A distance of fifty miles or less has routinely been held sufficiently close to the border to contribute to a finding of reasonable suspicion.[3]  *See Quintana-Garcia*, 343 F.3d at 1272 (fifty to sixty miles from the border)*; United States v. Barron-Cabrera*, 119 F.3d 1454, 1458 n.4 & 1460 (10th Cir. 1997) (forty-five miles from the border); *United States v. Lopez-Martinez*, 25 F.3d 1481, 1485 (10th Cir. 1994) (sixty miles from the border); *accord United States v. Venzor-Castillo,* 991 F.2d 634, 635 & 639 (10th Cir. 1993) (agent lacked reasonable suspicion to conduct a stop 235 miles from border).

Third, we consider the usual traffic patterns on the road where the stop was made.  Given the remote location of Rodeo, most traffic on Highway 80 tends to be local.  Agent Stevens testified he did not recognize the Thunderbird as a local vehicle and it carried Arizona plates.  Agent Stevens also testified it was unusual for non-local cars to travel that stretch of Highway 80 around 7:00 a.m.  While the presence of a foreign license plate would constitute stronger support of a

---

[3] "We also find it instructive, although not dispositive, that federal law permits Border Patrol agents to make warrantless stops within a 'reasonable distance' from the border." *Quintana-Garcia*, 343 F.3d at 1272 n.6 (quoting 8 U.S.C. § 1357(a)(3)); *see also Leyba*, 627 F.2d at 1065; *United States v. Venzor-Castillo*, 991 F.2d 634, 637-40 (10th Cir. 2001).  Federal regulations define "reasonable distance" as, *inter alia,* 100 miles from the border.  8 C.F.R. § 287.1(a)(2).

finding of reasonable suspicion, *see Quintana-Garcia*, 343 F.3d at 1268 (New Mexico stop of a vehicle with a Mexico licence plate), we have also found the presence of an out-of-state license plate from a neighboring state can contribute to such a finding. *See Barbee*, 968 F.2d at 1029 (New Mexico stop of a vehicle with Texas plates); *Cantu*, 87 F.3d at 1122 (same); *but see United States v. Martinez-Cigarroa,* 44 F.3d 908, 911 (10th Cir. 1995) ("[W]hile out-of-state license plates may be a relevant consideration in some circumstances, this factor in and of itself is not significantly probative of illegal activity and adds little to the reasonable suspicion equation.").

In this case, the significance of an Arizona license plate is diminished due to Rodeo's proximity to the Arizona state line. *Leyba*, 627 F.2d at 1064 ("That the vehicle bore out-of-state plates, as do 50 percent of all vehicles in which aliens are apprehended, is of little significance here simply because Arizona is relatively near."); *accord United States v. Espinosa-Alvarado*, 302 F.3d 304, 306 (5th Cir. 2002) (car with New Mexico plates stopped over forty-five miles from the Texas-New Mexico border). Even so, it is still "entitled to some limited consideration because [the] agent . . . did not recognize the vehicle as local traffic from the area." *Id*. Additionally, the significance of the Arizona license plate is increased in this case due to the fact that Border Patrol agents were conducting increased searches in Arizona, and New Mexico border patrol agents could consequently expect increased smuggling attempts redirected from Arizona.

*Accord Monsisvais,* 907 F.2d at 991 ("Although Arizona cars must certainly be less common on this stretch of road than those bearing New Mexico plates, *we cannot find any basis in the record from which to conclude that Arizona-plated vehicles are any more likely to be transporting aliens* . . . than are vehicles bearing the license plates of New Mexico, or, for that matter, Texas or Colorado.") (emphasis added).

Fourth, we consider the agents' previous experience with alien traffic.  At the time of the arrest, Agents Stevens and Gonzales had been with the Border Patrol and stationed at Lordsburg, New Mexico, covering the Rodeo area, for three and five years, respectively.  *See Barron-Cabrera*, 119 F.3d at 1461 (officer's three and a half years of experience as a border patrol agent in the area satisfied the fourth prong of *Brigoni-Ponce*).  Both testified they had extensive training in and experience with detecting and stopping illegal smuggling.  Additionally, the agents' shift changed at 7:00 a.m., and the agents were aware that smugglers often try to time their shipments around shift changes.  *See Espinosa-Alvarado,* 302 F.3d  at 305 n.2 ("Smugglers often wait for a shift change to smuggle narcotics or aliens into the country.").  This is supported in this case by the arrest the day before of nineteen illegal aliens apprehended near Rodeo around 7:00 a.m.

Fifth, we consider any information the agents might have had about recent illegal border crossings in the area.  Again, both Agent Stevens and Agent

Gonzales were aware that almost twenty-fours hours earlier a van-load of illegal aliens had been apprehended near Rodeo. Additionally, the morning of Mendez's arrest, Agent Stevens was searching for another group of aliens seen in the area. Moreover, as discussed above, Agents Stevens and Gonzales had reason to suspect an increased influx of illegal trafficking redirected from Arizona due to increased border patrols in that state.

Sixth, we consider any aspects of the vehicle itself that might support a finding of reasonable suspicion. Again, the presence of an out-of-state plate, while not strongly persuasive, supports reasonable suspicion. *See United States v. Neufeld-Neufeld,* 338 F.3d 374, 376-77 (5th Cir. 2003) (affirming the denial of a motion to suppress where the vehicle was, *inter alia*, not registered locally); *Diaz-Juarez,* 299 F.3d at 1140-43 (affirming the denial of a motion to suppress where the defendant's vehicle was, *inter alia*, not registered in the area). More importantly, we note Agent Gonzales' testimony that the trunk of the vehicle was not level and appeared to have been forced shut. Additionally, twine, consistent with drug packaging, was hanging out of the trunk.

Finally, we consider whether the vehicle appeared heavily loaded. Both agents testified the Thunderbird was riding low and appeared heavily loaded. Agent Stevens testified that when he first saw the car, "it appeared to be riding lower in the rear than normal," based on "the space between the tire and the fender." (R. Vol. III at 13, 14.) Agent Gonzalez testified specifically that the car

-11-

"was bouncing repeated[ly]," and that "the rear tire was almost touching the . . . fender." (*Id*. at 51.) Agent Gonzales testified he saw a passenger in the back seat of the car as well as two large packages when the car passed his position. *See United States v. Sperow*, 551 F.2d 808, 810 (10th Cir. 1977) (stop of a truck with a camper that appeared heavily loaded in New Mexico near the border was justified).

Our review of the facts of this case in light of the *Brignoni-Ponce* factors leads us to conclude that under the totality of the circumstances, Agent Gonzales' stop of Mendez's vehicle was supported by reasonable suspicion. While "any one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel, . . . taken together they amount to reasonable suspicion." *Quintara-Garcia*, 343 F.3d at 1274 (internal quotations omitted).

AFFIRMED.

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge