**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 21, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

SHASEL SARA OROZCO-RIVAS,

    Defendant - Appellant.

No. 19-6074
(D.C. No. 5:17-CR-00049-F-1)
(W.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HARTZ**, **MURPHY**, and **MATHESON**, Circuit Judges.
_____

Oklahoma Highway Patrol Trooper Brandon Bussey stopped Shasel Sara Orozco-Rivas's pickup truck for a traffic violation. He questioned Ms. Orozco, then detained her for about an hour pending the arrival of a drug-sniffing dog. The dog alerted at the bed of the truck, where officers found approximately eight pounds of methamphetamine. Ms. Orozco pled guilty to one count of conspiracy to possess with intent to distribute 50 grams or more of methamphetamine. She pled on the condition that she could appeal the

_____

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

district court's denial of her motion to suppress the methamphetamine as evidence. The court rejected her contentions that (1) Trooper Bussey lacked reasonable suspicion to detain her, and (2) the detention was unreasonably long. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. BACKGROUND

### A. *Factual Background*[1]

#### 1. The Stop

Trooper Bussey, while driving his patrol car on Interstate 40 in Beckham County, Oklahoma, saw Ms. Orozco and her passenger, Juan Carlos Vargas, pass in a pickup truck. As the truck passed, Trooper Bussey saw Ms. Orozco look in his direction and put her hand over her face. He perceived her to be "shocked." ROA, Vol. 2 at 19. He also believed the truck was too close to the car ahead, in violation of Oklahoma Highway Safety Code Title 47 § 11-310.

The highway had two lanes going the same direction, but one was closed and marked off with cones for construction. Trooper Bussey pulled into the closed lane and pursued Ms. Orozco, then entered the left lane behind the truck and turned on his

---

[1] We take the following facts from the suppression hearing and video of the stop.

emergency lights.[2]  As he trailed the truck, he saw the passenger, Mr. Vargas, turn and look back at him three or four times before returning to his seat.

Approximately one minute and 48 seconds—and about one mile—after Trooper Bussey turned on his lights, Ms. Orozco activated her right turn signal and hazard lights. Dft. Ex. 1 at 1:00-2:48.  She pulled between the cones into the closed lane and then onto the shoulder where she stopped.

Trooper Bussey stopped behind Ms. Orozco and approached the passenger side of the truck.  As he passed the truck bed, he saw a spare tire and a stroller.  He also noticed a small white wheel inside a tire that was too wide for the rim of the wheel and that appeared too small for the truck.

When Trooper Bussey reached the passenger window, Ms. Orozco was in the driver seat and Mr. Vargas was in the passenger seat.  He asked Ms. Orozco for her license, and Mr. Vargas said, "She don't, but I fell asleep."  ROA, Vol. 2 at 16.

Trooper Bussey testified that Mr. Vargas was sweating profusely, with beads of sweat on his forehead, cheek, and neck, despite the air conditioner running at "full blast." *Id.* at 25.  He said he could see Mr. Vargas's heart pounding and his stomach "bounc[ing] around." *Id.* at 25.  Mr. Vargas told Trooper Bussey he had a migraine and was sick from eating food from Panda Express.

---

[2] Trooper Bussey's patrol car camera recorded the events beginning one minute before he flashed his lights.  We cite the video, which was entered into evidence as "Defendant's Exhibit No. 1," as "Dft. Ex. 1 at x:xx-x:xx."

3

### 2. Ms. Orozco's Questioning

Trooper Bussey asked Ms. Orozco to come back to his patrol car. As she exited the truck and walked to the patrol car, he noted the stroller and asked if she had kids. She explained they were at her mother's house and that she and Mr. Vargas were driving to her uncle's ranch to help clean up.

When Ms. Orozco and Trooper Bussey reached the patrol car, they sat in the front seats. Trooper Bussey ran checks on the truck's license plate and on Ms. Orozco's and Mr. Vargas's criminal histories. As the checks were pending, he told Ms. Orozco that he would issue her a courtesy warning and let her and Mr. Vargas go.

Trooper Bussey asked Ms. Orozco for the location of her uncle's ranch. She hesitated and then described the place as "something with 'Will'" in the name. Dft. Ex. 1 at 5:44-5:47. She said it was past Amarillo. He asked for her uncle's name. Ms. Orozco hesitated and then responded, "well we always call him, um, uncle." *Id.* at 8:37-8:40.

Trooper Bussey left Ms. Orozco in his patrol car and returned to the passenger side of the truck. He asked Mr. Vargas about their destination, and Mr. Vargas replied that it was in Amarillo but he did not know exactly where. He said he and Ms. Orozco were visiting friends, but then clarified that he meant "friends and family." ROA, Vol. 2 at 36. He explained they were going to "build a fence for [Ms. Orozco's] friends." *Id.* Trooper Bussey testified that Mr. Vargas was still sweating profusely.

4

Trooper Bussey returned to his patrol car to wait for the criminal history checks. They revealed that Mr. Vargas had no criminal history and Ms. Orozco had an arrest but no conviction.

### 3. Post-Stop Detention

After Trooper Bussey returned Ms. Orozco's license to her and she started to leave the patrol car, he asked if she had time for more questions. She said "yes -- or yeah." *Id.* at 37. He then told her to shut the car door and asked whether there was anything illegal in the truck. She said there was not. When he asked for consent to search the truck, Ms. Orozco replied that he would need consent from Mr. Vargas because Mr. Vargas owned the truck.

Trooper Bussey told Ms. Orozco to stay in the patrol car. He approached the passenger side of the truck and asked Mr. Vargas for consent to search. Mr. Vargas consented and exited the truck, but then told Trooper Bussey he would not consent without a warrant. Trooper Bussey asked if he could get a dog to sniff the car, and Mr. Vargas did not answer. Trooper Bussey handcuffed Mr. Vargas, returned to his patrol car, and called the sheriff's office to bring a drug-sniffing dog.

### 4. Dog-Alert

After calling the sheriff's office, Trooper Bussey called his headquarters to make the official request for a drug-sniffing dog. He testified that the dog had to come from Custer County, where it lived. The dog arrived 51 minutes after Trooper Bussey's call. It alerted at the truck within five minutes. Two police officers arrived and searched the

5

truck, finding "around eight pounds" of methamphetamine in the tire of the small white wheel in the truck bed. *Id.* at 49.

## B. *Procedural History*

Ms. Orozco and Mr. Vargas were arrested and charged with possessing methamphetamine. Ms. Orozco did not challenge the validity of the stop. She claimed Trooper Bussey unconstitutionally detained her starting from when he told her to remain in the patrol car.[3] She moved to suppress the methamphetamine, arguing Trooper Bussey did not have reasonable suspicion of criminal activity when he detained her, and that the detention lasted unreasonably long.

Following a suppression hearing at which Trooper Bussey testified, the district court, ruling from the bench, denied the motion, calling it "a close case." *Id.* at 189. The court found Trooper Bussey had reasonable suspicion based on the totality of the circumstances, including:

    a. Ms. Orozco's placing her hand over her mouth when she saw Trooper Bussey;

    b. Mr. Vargas's "oscillation" between looking back at Trooper Bussey and facing forward, *id.* at 177;

    c. Ms. Orozco's delay in pulling over;

    d. The white wheel and ill-fitting tire in the truck's bed;

    e. Mr. Vargas's apparent extreme nervousness;

---

[3] Although Ms. Orozco initially agreed to answer more questions, we assume for purposes of this opinion that Trooper Bussey detained her once he returned her license.

f. Ms. Orozco's failure to identify a specific destination;

g. Ms. Orozco's apparent inability to recall her uncle's name;

h. Inconsistencies between Ms. Orozco's and Mr. Vargas's stories; and

i. Trooper Bussey's experience in drug interdiction.

Ms. Orozco entered a conditional guilty plea to one count of conspiracy to possess with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 846. The plea agreement allowed her to challenge the district court's denial of her motion to suppress. The district court sentenced her to five years of supervised release.

## II. DISCUSSION

### A. *Standard of Review*

In reviewing the denial of a motion to suppress, we accept the district court's factual findings unless clearly erroneous. *United States v. Moore*, 795 F.3d 1224, 1228 (10th Cir. 2015). We "give due weight to inferences drawn from those facts by resident judges and local law enforcement officers," *Ornelas v. United States*, 517 U.S. 690, 699 (1996), and "view the evidence in the light most favorable to the government," *Moore*, 795 F.3d at 1228. This deferential standard applies even though there is a video of the stop and detention. *United States v. Simpson*, 609 F.3d 1140, 1146 (10th Cir. 2010). We

7

"review de novo the ultimate determination of reasonableness under the Fourth Amendment." *Moore*, 795 F.3d at 1228 (emphasis and quotations omitted).[4]

## B. *Legal Background*

The Fourth Amendment prohibits unreasonable searches and seizures by the government. *See Terry v. Ohio*, 392 U.S. 1, 8 (1968); *United States v. Quintana-Garcia*, 343 F.3d 1266, 1270 (10th Cir. 2003).[5] The following discusses Fourth Amendment law regarding (1) traffic stops, (2) reasonable suspicion to detain, and (3) reasonableness of the length of detention.

### 1. **Traffic Stop**

Although Ms. Orozco does not contest the validity of the initial stop, we briefly explain the law. "A routine traffic stop is considered a seizure . . . ." *Moore*, 795 F.3d at 1228. A traffic stop must be (1) "justified at its inception," and (2) "reasonably related in scope to the justifying circumstances." *See United States v. Karam*, 496 F.3d 1157, 1161 (10th Cir. 2007) (quotations omitted). An officer must have "reasonable suspicion that this particular motorist violated any one of the multitude of applicable traffic and

---

[4] As we explained in *United States v. Santos*, 403 F.3d 1120, 1125 (10th Cir. 2005), this is "a peculiar sort of *de novo* review" that "looks more like . . . double deference."

[5] The Fourth Amendment's constitutional guarantees are "enforceable against the States through the Fourteenth [Amendment]." *Colorado v. Bannister*, 449 U.S. 1, 2 (1980) (per curiam).

equipment regulations of the jurisdiction." *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (en banc) (quotations omitted).

A traffic stop must "last no longer than is necessary to effectuate th[e] purpose" of the stop. *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (quotations omitted). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* "Once the warning or citation has been issued and the driver's license and registration have been returned, . . . the officer generally must allow the driver to proceed without further delay." *Karam*, 496 F.3d at 1161.

2. **Reasonable Suspicion**

An officer may extend a traffic stop beyond its initial purpose if it has "become consensual" or "if the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring." *United States v. Caro*, 248 F.3d 1240, 1244 (10th Cir. 2001). Reasonable suspicion exists where the officer identifies "specific, articulable facts" that, "in light of common sense and ordinary human experience," would lead a reasonable officer to suspect criminal activity. *Simpson*, 609 F.3d at 1146-47. Although "[t]he government bears the burden of proving the reasonableness of [an] officer's suspicion," *id.* at 1146, it "is not meant to be[] an onerous standard [and] requires considerably less than a preponderance of the evidence and obviously less than probable cause," *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015) (quotations omitted).

9

"[W]e accord deference to an officer's ability to distinguish between innocent and suspicious actions." *Simpson*, 609 F.3d at 1146. Officers are permitted "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Santos*, 403 F.3d 1120, 1134 (10th Cir. 2005) (quotations omitted). "[T]he existence of a plausible innocent explanation [for the defendant's conduct] does not preclude a finding of reasonable suspicion." *Pettit*, 785 F.3d at 1381.

Still, an officer's suspicion is unreasonable if it stems from facts "so innocent or susceptible to varying interpretations as to be innocuous." *Simpson*, 609 F.3d at 1147 (quotations omitted). An officer must cite "something more than an inchoate and unparticularized suspicion or hunch." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quotations omitted).

Whether an officer's suspicion is reasonable "does not depend on any one factor, but on the totality of the circumstances." *Simpson*, 609 F.3d at 1146. Even when each factor alone might be consistent with innocent travel, "the reasonable suspicion calculus turns on whether the specific articulable facts, when viewed together through the lens of a reasonable law enforcement officer," support reasonable suspicion of criminal activity. *United States v. Lopez-Martinez*, 25 F.3d 1481, 1484 (10th Cir. 1994).

3. **Length of Detention**

"Officers with reasonable suspicion to believe that the occupants of a vehicle are engaged in the unlawful transportation of contraband may detain the vehicle for a

10

reasonable time to obtain a properly trained dog to sniff for contraband." *United States v. Mendoza*, 468 F.3d 1256, 1261 (10th Cir. 2006). The Supreme Court has not adopted a time limit for reasonable detentions. *See, e.g.*, *United States v. Place*, 462 U.S. 696, 709 (1983) ("[W]e decline to adopt any outside time limitation" for a reasonable stop). Rather, "[i]n assessing whether a detention is too long in duration to be justified as an investigative stop, [courts] consider . . . whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly . . . ." *United States v. Sharpe*, 470 U.S. 675, 686 (1985); *see also Mendoza*, 468 F.3d at 1261 (holding a 40-minute delay was reasonable "[g]iven the distance between the scene of the detention and the nearest [dog-]handler"); *United States v. Villa-Chaparro*, 115 F.3d 797, 803 (10th Cir. 1997) (upholding a denial of a motion to suppress where police detained the defendant for 43 minutes, 38 minutes of which was spent awaiting a drug-sniffing dog).

## C. *Analysis*

Viewing the facts in the aggregate, and in the light most favorable to the Government, we conclude that Trooper Bussey had reasonable suspicion to detain Ms. Orozco. And because law enforcement was diligent in bringing a drug-sniffing dog to the scene, the length of the detention was reasonable.

### 1. **Reasonable Suspicion for Detention**

The district court listed the reasons leading to Ms. Orozco's detention for suspicion of criminal activity. We assess each in turn.

11

a. *Ms. Orozco's apparent surprise at seeing Trooper Bussey*

We have attributed little weight to a passenger's surprise at seeing an officer. *See, e.g.*, *Fernandez*, 18 F.3d at 879 (finding a passenger's "startled awakening" while an officer was questioning the driver to be insignificant). Ms. Orozco's reaction to seeing Trooper Bussey's car was at most a minor factor in forming reasonable suspicion.

b. *Mr. Vargas looking back at Trooper Bussey*

Mr. Vargas's repeated glances back at the trailing patrol car before the stop provided minimal support for reasonable suspicion. Together with Mr. Vargas's apparent nervousness during questioning, Trooper Bussey was appropriately wary of this behavior. *See, e.g.*, *Lopez-Martinez*, 25 F.3d at 1487 (holding that a passenger in a van "peer[ing] through the van's back window, star[ing] at [the agent] for roughly twenty to thirty seconds, and then 'sinking back out of sight'" contributed to the agent's reasonable suspicion).

Still, the Government offers little explanation for why a passenger who oscillates between looking back at a trailing police car and sitting in his seat evinces criminal activity. Mr. Vargas might have wanted to know, for example, whether Trooper Bussey was signaling to pull into the closed lane or trying to pass to get to another car. *See Simpson*, 609 F.3d at 1146 (viewing reasonableness through the lens of "common sense and ordinary human experience" (quotations omitted)).

12

c. *Failure to stop promptly*

Ms. Orozco's delay in pulling over contributed to reasonable suspicion. *See, e.g.*, *United States v. Hunnicutt*, 135 F.3d 1345, 1347 (10th Cir. 1998) (finding a defendant's "ten to twelve second[]" delay in pulling over to be a factor favoring reasonable suspicion); *United States v. Fernandez*, 18 F.3d 874, 878 (10th Cir. 1994) (recognizing that "a defendant's . . . failure to pull over promptly in response to a trooper's flashing lights [can be] an objective indication of something more serious than a minor traffic infraction.").

The district court found that Ms. Orozco was "well aware" of Trooper Bussey's patrol car when he pulled behind her with his lights on. ROA, Vol. 2 at 178. Even so, Ms. Orozco took over one minute and 45 seconds—and one mile—to stop. Trooper Bussey testified that, even if drivers take a long time to pull over, they "typically . . . put their turn signal on or they'll put their four-ways on from when they see my lights." ROA, Vol. 2 at 59. Ms. Orozco did not activate her signal until at least one minute and 45 seconds after Trooper Bussey pulled behind her truck with his lights on.

Ms. Orozco contends the closure of the right lane explains the extended time it took her to pull over. But even if this explanation is plausible, we must accept Trooper Bussey's inferences when they are reasonable. *See Pettit*, 785 F.3d at 1381 (accepting an officer's "objectively reasonable" inference about a suspicious cause of the defendant's behavior despite the defendant's "plausible innocent explanation"). He noted "there[] [was] ample room in between the cones to move, to pull over." ROA, Vol. 2 at 59. Our

13

review of the video confirms this statement, and Ms. Orozco had no apparent difficulty driving between the cones to stop. *See* Dft. Ex. 1 at 3:00-3:33. We conclude Trooper Bussey reasonably found the delay suspicious.

d. *The irregular tire*

The small white wheel with the large tire in the truck bed contributed little to reasonable suspicion. Although an irregular spare tire in the bed of a pickup truck can be "of considerable importance," *United States v. Gandara-Salinas*, 327 F.3d 1127, 1131 (10th Cir. 2003), and Trooper Bussey's drug interdiction experience is entitled to deference, *see Santos*, 403 F.3d at 1134, he noted only that the tire "seemed odd," ROA, Vol. 2 at 48. He did not say why it suggested criminal activity.

e. *Mr. Vargas's apparent extreme nervousness*

Coupled with the other facts, Mr. Vargas's demeanor during questioning supported reasonable suspicion. Although mere "nervousness is of limited significance in determining reasonable suspicion," *United States v. Wood*, 106 F.3d 942, 948 (10th Cir. 1997), uncommon nervousness "may contribute marginally to a reasonable suspicion of illegal activity," *United States v. Davis*, 636 F.3d 1281, 1291-92 (10th Cir. 2011). And even when extreme nervousness is not apparent from the video of a stop, the district court may rely on the questioning officer's testimony. *See United States v. Kitchell*, 653 F.3d 1206, 1221 (10th Cir. 2011).

Here, the district court found that "Mr. Vargas' nervousness and sweating has been credibly described as being well in excess of the physical response normally

14

observable in an innocent driver."  ROA, Vol. 2 at 189; *see also Simpson*, 609 F.3d at 1148 (finding uncommon nervousness where a driver "chang[ed] the topic; swallow[ed] hard; lick[ed] his lips which were quivering; and nervously stroke[ed] the top edge of the head line of the patrol car with his hand"); *Davis*, 636 F.3d at 1292 (finding uncommon nervousness when the driver was shaking).  Although Mr. Vargas's sweatiness may have been consistent with food poisoning or a migraine, Trooper Bussey reasonably inferred that he was extremely nervous because of the stop.  *See Pettit*, 785 F.3d at 1381 (accepting an officer's "objectively reasonable" inference that the defendant was nervous about the officer's questioning, not, as the defendant claimed, "rattled by" a snow storm he had just encountered).  Mr. Vargas's extreme nervousness is entitled to some weight, though it was not alone enough to create reasonable suspicion.

f. *Ms. Orozco's failure to identify a destination*

Ms. Orozco's failure to tell Trooper Bussey her destination supported reasonable suspicion.  *See, e.g.*, *Kopp*, 45 F.3d at 1453-54 (finding reasonable suspicion where a driver claimed he was transporting a couch from California to North Carolina but was unclear about where in North Carolina).  When asked where she and Mr. Vargas were going, she said the place was "something with 'Will'" in the name.  Dft. Ex. 1 at 5:44-5:47.  Given her hesitation and inability to specify, Trooper Bussey's inference that she was making up a story was reasonable, even if her statement also was consistent with a lapse in memory.  *See Pettit*, 785 F.3d at 1379.

15

g. *Ms. Orozco's inability to recall her uncle's name*

Ms. Orozco's failure to tell Trooper Bussey her uncle's name contributed to reasonable suspicion. Although failure to recall details about family members can be innocent, *see, e.g.*, *Santos*, 403 F.3d at 1131 (explaining that "[i]t may be lamentable that an uncle would not know the ages of his nieces and nephews, but it is hardly an indication that crime is afoot"), a defendant's inability "to supply corroborative details ordinarily known to a family member" can contribute to reasonable suspicion, *id.*

When Trooper Bussey asked Ms. Orozco her uncle's name, she said "we just call him, um, uncle." Dft. Ex. 1 at 8:37-8:40. Combined with her delay in pulling over, her failure to specify the destination to which she was driving, and Mr. Vargas's different account of the trip's purpose, Trooper Bussey reasonably inferred she was not forthcoming. *See Santos*, 403 F.3d at 1131.

h. *Inconsistencies in stories*

The inconsistencies between Ms. Orozco's and Mr. Vargas's stories supported reasonable suspicion. "As with unusual travel plans, inconsistencies in information provided to the officer during the traffic stop may give rise to a reasonable suspicion of criminal activity." *Wood*, 106 F.3d at 947. Although some inconsistencies count only when combined with other factors, *see Simpson*, 609 F.3d at 1150, varying statements by a driver and passenger about travel plans can matter, *see Davis*, 636 F.3d at 1291; *see also United States v. Kopp*, 45 F.3d 1450, 1453-54 (10th Cir. 1995) (finding meaningful

16

that a driver and passenger travelling across the country provided inconsistent prospective return dates).

Ms. Orozco told Trooper Bussey she and Mr. Vargas were going to her uncle's ranch to help clean up. Mr. Vargas told him they were visiting Ms. Orozco's friends and family to help build a fence.[6] Although this may have been a benign inconsistency, Trooper Bussey could reasonably have suspected dissembling, especially given Ms. Orozco's inability to state her destination or name her uncle. *See Ornelas*, 517 U.S. at 699 (recognizing the need to "give due weight to inferences drawn from th[e] facts by resident judges and local law enforcement officers").

i. *Trooper Bussey's experience in drug interdiction*

Finally, although the district court listed Trooper Bussey's drug interdiction experience as a factor contributing to reasonable suspicion, we consider that experience only in deferring to his reasonable inferences, *see Santos*, 403 F.3d at 1134, not as a distinct factor.

\* \* \* \*

The totality of the evidence, viewed in the light most favorable to the Government, shows Trooper Bussey had reasonable suspicion to detain Ms. Orozco. He pointed to "specific, articulable facts" that, "in light of common sense and ordinary human

---

[6] At first, Mr. Vargas said only that they were visiting friends.

17

experience," would lead a reasonable officer to suspect criminal activity. *Simpson*, 609

F.3d at 1146-47.

Although each fact alone might not have been sufficient, and some had more

weight than others, Trooper Bussey's suspicion was reasonable considering them in

combination. He appropriately considered the time Ms. Orozco took to pull over, Mr.

Vargas's behavior and extreme nervousness, the odd white wheel and irregular tire, the

inconsistencies in stories, Ms. Orozco's inability to specify a destination, and her

inability to provide her uncle's name. As reasonable suspicion "is not meant to be[] an

onerous standard [and] requires considerably less than a preponderance of the evidence

and obviously less than probable cause," the Government's showing was sufficient.

*Pettit*, 785 F.3d at 1379 (quotations omitted).

2. **Reasonable Delay Bringing the Dog**

The length of the detention also was reasonable. Trooper Bussey and the dog's

handler were diligent in getting the dog to the scene. Trooper Bussey testified that he

called the handler before calling headquarters to "shorten the detention time." ROA,

Vol. 2 at 42. The nearest drug-sniffing dog, which lived in the Clinton area, arrived 51

minutes after Trooper Bussey called. Clinton, Oklahoma is approximately 45 miles east

of central Beckham County.[7] The stop occurred in western Beckham County. Thus, the

---

[7] Because the parties did not provide a map, we take judicial notice of the distance as calculated using Google Maps. *See Pahls v. Thomas*, 718 F.3d 1210, 1216 n.1 (10th Cir. 2013) (taking judicial notice of a satellite image using Google Maps); David J. Dansky, *The Google Knows Many Things: Judicial Notice in the Internet Era*, 39 Colo. Law. 19, 24 (2010) ("Most courts are willing to take judicial notice of geographical facts

18

length of detention was reasonable.  *See Mendoza*, 468 F.3d at 1261; *Villa-Chaparro*, 115 F.3d at 803.

## III. **CONCLUSION**

We uphold the district court's denial of Ms. Orozco's motion to suppress and affirm the judgment.

Entered for the Court

Scott M. Matheson, Jr.
Circuit Judge

---

and distances from private commercial websites such as MapQuest, Google Maps, and Google Earth.").  We use the Google Maps directions from Clinton, Oklahoma, to Beckham County, Oklahoma.  The shortest route—by distance and time—is 45.8 miles and 40 minutes, with the usual traffic.  *See* Driving Directions from Clinton, OK to Beckham County, OK, Google Maps, https://perma.cc/E38V-ATTX.